**CHILDREN'S NATIONAL MEDICAL CENTER and Frank Gates Service Company/Avizent, Petitioners,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

**Beverly McCormick, Intervenor.**

**No. 09–AA–58.**

District of Columbia Court of Appeals.

Argued Feb. 25, 2010.

Decided April 8, 2010.

David M. Schoenfeld, Rockville, MD, for petitioner.

Richard S. Love, Senior Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Douglas K. Allston, Jr., Greenbelt, MD, for intervenor.

Before RUIZ and FISHER, Associate Judges, and BELSON, Senior Judge.

FISHER, Associate Judge:

In the workers' compensation system, utilization review ("UR") is a statutory procedure for determining "the necessity, character, or sufficiency of any medical care or service furnished or scheduled to be furnished" to an injured employee. D.C.Code § 32–1507(b)(6)(A) (2001). In this case, the Department of Employment Services ("DOES") held that the UR process had been completed although the employee's physician had not sought reconsideration of an adverse opinion. Holding that the agency's decision was based on a permissible interpretation of the statute, we affirm.

## I. Factual and Procedural History

In October 2007, Beverly McCormick, a housekeeper at Children's National Medical Center ("CNMC"), slipped on a wet floor and, although she did not fall, twisted her right knee. Following the accident, her knee was treated with rest, a steroid injection, and arthroscopic surgery. In July 2008, when the joint could no longer bear weight, she chose to have a total right knee replacement.

Prior to the accident, Ms. McCormick (sometimes referred to as "claimant") suffered from end-stage degenerative osteoarthritis in both knees. Dr. Samir Azer, an orthopaedic surgeon, began treating her in the fall of 2006, injecting a steroid first into her "more symptomatic" right knee, then into her left knee the following week. At that time he advised claimant that she would likely need to have both knees replaced in the "foreseeable future." In April 2007, he injected a steroid into her left knee after she complained of pain there, and then injected the right knee four weeks later. In August 2007, he began Synvisc[1] injections to both knees.

---

1. Synvisc is a compound used as a joint lubricant in the treatment of osteoarthritis.

After claimant slipped and twisted her right knee in October 2007, Dr. Azer examined the joint and diagnosed a sprain or strain, noting that her right knee had been "doing better" following the Synvisc injections but before she slipped. When the knee did not improve with rest, he ordered an MRI, which showed advanced degenerative arthritis and what Dr. Azer believed was a degenerative tear of the medial meniscus. He injected the knee with a steroid and, after it did not improve, performed an arthroscopy in January 2008. Dr. Azer described the arthroscopy as "a palliative procedure with no cure [for] ... the degenerative changes that she has." He did not find a torn medial meniscus during the surgery.

By May 2008, claimant reported constant and "excruciating" pain. When claimant declared in July that she could no longer put weight on the joint and wanted the operation, Dr. Azer scheduled her for a total right knee replacement.

The employer obtained the opinion of an independent medical examiner ("IME"), who recommended against knee replacement and found "no causal relationship between the work related injury and her current symptomatology[,]" stating "I don't think [the injury] hastened, exacerbated or made the arthritis progress in any way." The employer also initiated the UR process. Although the doctor conducting the utilization review agreed that replacement of the knee was medically necessary and appropriate, he determined that claimant was not an appropriate candidate for the surgery at that time because she weighed too much. Dr. Azer received a copy of the utilization report, but he did not request reconsideration, although he was entitled to do so under D.C.Code § 32–1507(b)(6)(C).

Dr. Azer testified during his deposition (which took place after the UR report was issued) that "having treated both [knees] with Synvisc injections, ... the fact that she has not complained of her left knee at all leads me to believe that the injury aggravated the preexisting degenerative arthritis [of her right knee] enough to at least accelerate significant[ly] the need for her total [right] knee [replacement]." Dr. Azer disagreed with the utilization reviewer's opinion that Ms. McCormick was not an appropriate candidate for the surgery. Referring to a recent NIH study, he testified that obesity was not a contraindication to total knee replacement, and explained that expecting obese patients to lose weight prior to knee replacement is "totally unrealistic" because such patients cannot move, exercise, or be active.

After a formal hearing, an administrative law judge ("ALJ") issued a compensation order approving the knee replacement. Relying upon Dr. Azer's opinion that the accident accelerated the need for the knee replacement, the ALJ concluded that the surgery was causally related to the workplace injury. Noting Dr. Azer's reference to the NIH study, the ALJ also concluded that total right knee replacement was "medically necessary." After the Compensation Review Board ("the Board") affirmed the compensation order, *McCormick v. Children's Nat'l Med. Ctr.*, CRB No. 09–016, 2009 WL 345799, 2009 DC Wrk. Comp. Lexis 11 (Jan. 2, 2009), CNMC petitioned for review.

## II. Standard of Review

■■■ We may reverse a Compensation Review Board decision "only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *McNeal v. District of Columbia Dep't of Employment Servs.*, 917 A.2d 652, 656 (D.C.2007); *see* D.C.Code § 2–510(a)(3)(A) (2001), *formerly* D.C.Code § 1–1510(a)(3)(A) (1981). We will affirm the

decision if "(1) the agency made findings of fact on each contested material factual issue, (2) substantial evidence supports each finding, and (3) the agency's conclusions of law flow rationally from its findings of fact." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, 971 A.2d 909, 915 (D.C.2009). As we have explained many times, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *King v. District of Columbia Dep't of Employment Servs.*, 560 A.2d 1067, 1072 (D.C.1989) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The debate does not have to be one-sided. "[T]here can be substantial evidence on both sides of a dispute." *Johnson v. District of Columbia Office of Employee Appeals*, 912 A.2d 1181, 1185 (D.C.2006).

We defer to an agency's interpretation of a statute it administers unless the interpretation "is unreasonable or in contravention of the language or legislative history of the statute. . . ." *Watergate East Comm. Against Hotel Conversion v. District of Columbia Zoning Comm'n*, 953 A.2d 1036, 1043 (D.C.2008) (quotations and citations omitted); *see Mushroom Transp. v. District of Columbia Dep't of Employment Servs.*, 761 A.2d 840, 844 (D.C.2000) ("[W]here DOES has analyzed the language, legislative history and purpose of a provision of the Workers' Compensation Act, and articulates a reasonable interpretation of that provision based on that analysis, that interpretation is authoritative.") (quotations and citations omitted). However, we will not defer to the agency if its decision "reflects a misconception of the relevant law or a faulty application of the law." *Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 169 (D.C. 1979).

### III. Causation

 Petitioner contends that the ALJ's conclusion that the injury caused claimant to need a knee replacement is not supported by substantial evidence, arguing that Ms. McCormick needed that treatment anyway because she had end-stage degenerative arthritis. Of course, the fact that Ms. McCormick suffered from arthritis before the accident does not bar her claim. If a work-related injury aggravates an employee's preexisting condition, it may be compensable. D.C.Code § 32–1508(6)(A) (2001) ("If an employee receives an injury, which combined with a previous . . . disability or physical impairment causes *substantially* greater disability . . ., the liability of the employer shall be as if the subsequent injury alone caused the subsequent amount of disability. . . ." (emphasis added)); *see also Ferreira v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 651, 657 (D.C.1987) (citing *Hensley v. Washington Metro. Area Transit Auth.*, 210 U.S.App.D.C. 151, 154–55, 655 F.2d 264, 267–68 (1981) (applying the "aggravation rule" to find aggravation of a claimant's preexisting psoriasis compensable under the Longshoremen's and Harbor Workers' Compensation Act)); *see also Washington Vista Hotel v. District of Columbia Dep't of Employment Servs.*, 721 A.2d 574, 579 (D.C.1998) (cautioning that aggravation must still be proved).

 Acceleration of a preexisting condition may constitute aggravation.[2] *See*

---

**2.** A few jurisdictions expressly limit this principle by requiring that, where there is a preexisting condition, the aggravating injury must "significantly" or "substantially" accelerate the need for treatment. *See, e.g.,* N.D.

Cent.Code § 65–01–02(10)(b)(7) (2009) (a compensable injury does not include a preexisting condition "unless the employment substantially accelerates its progression or substantially worsens its severity"); Me.Rev.Stat.

*McCamey v. District of Columbia Dep't of Employment Servs.*, 947 A.2d 1191, 1197–98 (D.C.2008) (en banc) (quoting 1 LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 9.02[1] (Matthew Bender, 2009) ("Preexisting disease or infirmity . . . does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, or combined with the disease or infirmity to produce the death or disability for which compensation is sought.")); *see, e.g., Avignone Freres, Inc. v. Cardillo,* 73 App. D.C. 149, 150, 117 F.2d 385, 386 (1940) (discussing the Longshoremen's and Harbor Workers' Compensation Act and stating: "To hasten death is to cause it."); *Chevalier v. L.H. Bossier, Inc.,* 617 So.2d 1278, 1283 (La.Ct.App.1993) (where claimant inevitably would have developed arthritis, traumatic injury that accelerated and worsened the arthritis was compensable).

Petitioner's core argument is that Dr. Azer's opinion does not constitute substantial evidence because he was unreliable and his opinion was illogical. Petitioner emphasizes, among other things, that Dr. Azer diagnosed a torn posterior horn medial meniscus in claimant's knee but did not find such a tear during the arthroscopy.

As the Board pointed out, it was the ALJ's role to assess credibility, and he was not required to discount Dr. Azer's opinion merely because the arthroscopy did not reveal the torn medial meniscus that both Dr. Azer and a radiologist thought they observed when reading the MRI.[3] *See Washington Vista Hotel,* 721 A.2d at 578 (a hearing examiner's decision to credit one physician's opinion over another's may be reversed only if it is unsupported by substantial evidence).

Petitioner argues that it was illogical for Dr. Azer to conclude that Ms. McCormick needed a total knee replacement because she twisted her knee, when she already had end-stage arthritis. Petitioner emphasizes that claimant was told several times that she would need a knee replacement. However, there is no evidence that claimant needed, or was told that she would need, a knee replacement by any specific date.[4] *See Jackson v. District of Columbia Dep't of Employment Servs.,* 979 A.2d 43, 51 (D.C.2009) (reversing a compensation order denying a knee replacement for an arthritic claimant where the independent medical examiner incorrectly believed that surgery had already been scheduled prior to claimant's work-related injury).

ANN. tit. 39–A § 201(4) (2009) ("If a work-related injury aggravates, accelerates or combines with a preexisting physical condition, any resulting disability is compensable only if contributed to by the employment in a significant manner."). While our jurisdiction does not have such an express limitation specifically linked to acceleration, all forms of aggravation are subject to the "substantially greater disability" language in the statutory provision dealing with preexisting conditions. D.C.Code § 32–1508(6)(A).

3. Petitioner further argues that Dr. Azer's opinion should be discounted because it was offered in an effort to get his bills paid. This is also a matter of assessing the weight of the evidence, which is the ALJ's role.

4. Dr. Azer advised claimant in October 2006 that "in the foreseeable future she will most likely need a knee replacement." He later explained: *"When* in the future, obviously, is totally unpredictable because it depends upon symptoms." Notes from a visit to her primary care doctor almost a year later state only that she "may need knee surgery." And while petitioner asserts that "according to the treating physician, the Claimant's need for surgery was imminent, before the alleged injury," Dr. Azer, in an unusual choice of words, testified only that "total knee replacement is going to be imminent *at some point."*

Petitioner also points to the IME's conclusion that the accident did not "hasten" the need for a knee replacement. This may be substantial evidence supporting a contrary finding, but, as we have pointed out, "there can be substantial evidence on both sides of a dispute." *Johnson*, 912 A.2d at 1185.[5]

The ALJ relied instead on Dr. Azer's opinion (as expressed in his deposition and in his progress notes) regarding causation. The doctor noted the claimant's report that both knees had been doing "somewhat better" before the accident. He testified that for a year following the injections Ms. McCormick had not complained of her left knee, but that he had been attempting to manage pain in her right knee since the accident. Claimant also testified that her knee had gotten worse after the accident.

Because the course of treatment for the two knees had been similar before the accident,[6] Dr. Azer's opinion that the injury had significantly accelerated claimant's need for replacement of her right knee is not illogical, as petitioner claims. More-over, Dr. Azer's opinion carries additional weight because of the preference we give to the views of the treating physician. *Jackson*, 979 A.2d at 49. There was substantial evidence to support the ALJ's finding that the workplace injury to claimant's right knee on October 2, 2007, was "medically causally related to her current disability." [7]

## IV. Utilization Review

■ If an employee suffers a workplace injury that is medically causally related to a disability that requires treatment, a distinct question may arise: is the proposed medical treatment reasonable and necessary? Utilization review is a process for addressing that question, and in this context it "means the evaluation of the necessity, character, and sufficiency of both the level and quality of medically related services provided an injured employee based upon medically related standards." D.C.Code § 32–1501(18A) (2001); *see, e.g., Hisler v. District of Columbia Dep't of*

---

5. Petitioner also claims that the injury was not causally related because there was no direct trauma to the knee. However, petitioner points to no evidence that the absence of a direct blow means that the injury was necessarily insufficient to aggravate claimant's preexisting condition. Moreover, we have held that compensable injuries may occur without direct trauma. *See Ferreira*, 531 A.2d at 656 ("This jurisdiction has repeatedly rejected the notion that a 'specific traumatic injury' is necessary to establish a prima facie case of an 'accidental injury.' "); *see also King v. District of Columbia Dep't of Employment Servs.*, 742 A.2d 460, 468 (D.C.1999) (discussing aggravation caused by "cumulative trauma").

6. In the year before the accident, Dr. Azer gave the same injections to both knees, although with some variations. In October 2006, he injected a steroid first into her right knee, then injected the left a week later; in April 2007, he injected a steroid into her left knee first, then injected the right a month later. When he gave her the Synvisc injec-tions, he injected both knees at each of the three visits.

7. The ALJ concluded that Dr. Azer's "assessment provides a more logical rationale for Claimant's medical condition" and relied as well on the treating physician preference. However, the ALJ also remarked that the IME "appears to concede [that the injury] aggravated the preexisting condition." Considered in isolation, this latter comment would cause us concern because, when the IME used the word "aggravate," he meant only that the injury caused a flare-up—a temporary injury that subsided and left no net damage. While this passage of the compensation order could have been more clear, we are satisfied that the ALJ understood that the IME thought the injury did not cause or accelerate the need for a knee replacement. The ALJ accurately paraphrased the IME's view as stating the injury "in no way hastened the need for knee replacement" and acknowledged that the IME "ultimately concluded the work incident did not worsen Claimant's arthritic condition."

*Employment Servs.*, 950 A.2d 738, 746 (D.C.2008) (affirming the denial of reimbursement for megavitamin infusions even though causation was conceded, where an administrative law judge properly relied on the opinion of a utilization reviewer that the infusions were not necessary). The appropriateness of any medical care furnished, or scheduled to be furnished, to an employee through workers' compensation may be reviewed under the UR procedures contained in D.C.Code § 32–1507(b)(6).[8] The process may be initiated by an employer, the employee, or the Mayor, D.C.Code § 32–1507(b)(6)(B), and "[t]he review may be performed before, during or after the medical care or service is provided." 7 DCMR § 232.1 (1994).

Although the implementing regulations are sparse, it appears that the utilization reviewer accepts the diagnosis of injury, examines the claimant's medical records, and makes findings concerning "the necessity, character or sufficiency" of the medical services to treat the injury. 7 DCMR § 232.3. He or she then issues a report describing which records were reviewed and "set[ting] forth rational medical evidence to support each finding." 7 DCMR § 232.4. The regulations require that the report be issued to the agency, the employer, and the employee, but do not mention providing a copy to the treating physician. *Id.*

The Council of the District of Columbia added the utilization review process in order "[t]o stem the rising cost of medical care and services without jeopardizing appropriate medical care for injured workers."[9] D.C. Council, Report on Bill 8–74

---

8. The relevant portions of D.C.Code § 32–1507(b)(6) are as follows:

(6) Any medical care or service furnished or scheduled to be furnished under this chapter shall be subject to utilization review. Utilization review may be accomplished prospectively, concurrently, or retrospectively.

(A) In order to determine the necessity, character, or sufficiency of any medical care or service furnished or scheduled to be furnished under this chapter and to allow for the performance of competent utilization review, a utilization review organization or individual used pursuant to this chapter shall be certified by the Utilization Review Accreditation Commission.

(B) When it appears that the necessity, character, or sufficiency of medical care or service to an employee is improper or that medical care or service scheduled to be furnished must be clarified, the Mayor, employee, or employer may initiate review by a utilization review organization or individual.

(C) If the medical care provider disagrees with the opinion of the utilization review organization or individual, the medical care provider shall have the right to request reconsideration of the opinion

by the utilization review organization or individual 60 calendar days from receipt of the utilization review report. The request for reconsideration shall be written and contain reasonable medical justification for the reconsideration.

(D) Disputes between a medical care provider, employee, or employer on the issue of necessity, character, or sufficiency of the medical care or service furnished, or scheduled to be furnished, or the fees charged by the medical care provider shall be resolved by the Mayor upon application for a hearing on the dispute by the medical care provider, employee, or employer. A party who is adversely affected or aggrieved by the decision of the Mayor may petition for review of the decision by the District of Columbia Court of Appeals.

9. The District enacted utilization review at a time when many states were adding utilization review requirements, adapted from the procedures of managed care organizations, to their workers' compensation statutes. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 45–47, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (discussing the adoption of utilization review by Pennsylvania in 1993); *see also* Gerald W. Tracy, *The Importation of Managed Care to the Workers' Compensation System:*

at 19 (July 6, 1990). Observing that the legislature's intent was to adopt "a utilization review paradigm," the Compensation Review Board has held that, if there is a dispute about the necessity of proposed medical treatment, utilization review is the mandatory first step in the resolution of that dispute. *Gonzalez v. UNICCO Serv. Co.*, CRB No. 07–005, 2007 WL 867067, at *13, 2007 DC Wrk. Comp. Lexis 95, at *39 (Feb. 21, 2007) (Utilization review under § 32–1507(b)(6) is "the exclusive and mandatory procedure envisioned by the legislature for resolution of all disputes arising under the Act which relate to 'the necessity, character, or sufficiency of any medical care or service furnished or scheduled to be furnished.' ").[10] In this case petitioner initiated utilization review, and neither party asks us to decide that the UR process is optional, rather than mandatory. We therefore assume that it is mandatory, without deciding the question, and focus on whether the UR process was completed.

 A medical care provider who disagrees with the UR report may request that the reviewer reconsider his or her decision. "The request for reconsideration shall be written and contain reasonable medical justification for the reconsideration." D.C.Code § 32–1507(b)(6)(C).

"Disputes between a medical care provider, employee, or employer on the issue of necessity, character, or sufficiency of the medical care or service furnished, or scheduled to be furnished, ... shall be resolved by the Mayor upon application for a hearing on the dispute by the medical care provider, employee, or employer." D.C.Code § 32–1507(b)(6)(D). The Board has explained that the Act is "designed" to give the responsibility for resolving disputes about medical care "first to an accredited 'utilization review' person or organization, and then, in the instance of a continuing dispute, to this Agency through a formal hearing." *Gonzalez*, 2007 WL 867067, at *15, 2007 DC Wrk. Comp. Lexis 95, at *45. The utilization review report is not binding on DOES, but we have held that if the agency disagrees, it must "address specifically this report and articulate reasons why this report is being rejected." [11] *Sibley Mem'l Hosp. v. District of Columbia Dep't of Employment Servs.*, 711 A.2d 105, 107 (D.C.1998).

The Board has held that a party or medical care provider may seek a hearing before the agency to contest the UR determination only if the mandatory UR process has been completed. *Haregewoin*[12] v.

---

*Time for Re-evaluation and Re-direction*, 9 HEALTH LAWYER 16 (1997).

**10.** Although the Board used the term "exclusive" in this discussion from *Gonzalez*, it clarified in this case that "we did not hold, or intend to suggest or imply that such issues could never be brought to a formal hearing." *McCormick*, 2009 WL 345799, at *3, 2009 DC Wrk. Comp. Lexis 11, at *10 (citing *Gonzalez*, 2007 WL 867067, at *13, 2007 DC Wrk. Comp. Lexis 95, at *39).

**11.** The Board has held that at a formal agency hearing on the necessity or sufficiency of care, as opposed to causation, there is no preference for the opinion of either the medical care provider or the utilization reviewer. *Haregewoin*, 2008 WL 788313, at *3, 2008 DC

Wrk. Comp. Lexis 32, at *8 ("[W]e view [§ 32–1507(b)(6)] as placing an obligation upon the ALJ to weigh the competing opinions based upon the record as a whole, and to explain why the ALJ chose one opinion and not the other, but [the statute] does not require that either opinion be given an initial preference."); *see also Green v. Washington Hosp. Ctr.*, CRB No. 08–208, 2009 WL 2058375, at *3, 2009 DC Wrk. Comp. Lexis 107, at *10 (June 17, 2009) ("On the question of reasonableness and necessity, the UR is not 'dispositive,' but rather ... stands on equal 'preferential' footing with an opinion of a treating physician.").

**12.** The claimant's last name is actually Desta. *See Lopez v. The Chimes, Inc.*, AHD No. 07–

Loews Washington Hotel, CRB No. 08–068, 2008 WL 788313, at \*3, 2008 DC Wrk. Comp. Lexis 32, at \*8–9 (Feb. 19, 2008) (holding that if utilization review "procedures have not been exhausted, a formal hearing on the reasonableness and necessity of the requested medical care is premature"). The Board has also held that utilization review is complete only if there has been a request for reconsideration. *Chaupis v. George Washington Univ.*, CRB 08–075, 2008 WL 965886, at \*6, 2008 DC Wrk. Comp. Lexis 45, at \*18 (March 4, 2008) ("a request for reconsideration ... is required by the statute"); *Chaupis*, 2008 WL 965886, at \*6, 2008 DC Wrk. Comp. Lexis 45, at \*17 ("failure to follow the reconsideration provisions results in the UR determination becoming dispositive").

Petitioner argues that Ms. McCormick was not entitled to agency review of her dispute over the appropriateness of the knee replacement because: 1) utilization review must be completed, 2) utilization review is completed only if there has been a request for reconsideration, 3) only the medical care provider may request reconsideration, and 4) Dr. Azer did not request reconsideration. The Board avoided the force of this syllogism by clarifying the process to permit a claimant or employer to seek a formal hearing regardless of whether the medical care provider requests reconsideration. It held "that the UR process is complete, for the purposes of obtaining a formal hearing by the claimant or employer, upon obtaining the initial UR report." *McCormick*, 2009 WL 345799, at \*5, 2009 DC Wrk. Comp. Lexis 11, at \*15.

The Board reached this conclusion by focusing on the statutory provision authorizing requests for reconsideration and thereafter reversing a portion of its holding in *Chaupis*.[13] It emphasized that, under D.C.Code § 32–1507(b)(6)(C), the right to request reconsideration "is not given to anyone other than the medical care provider. Specifically, it is not given to either the employer or the claimant." [14] *McCor-*

---

295B, 2009 WL 5214395, n. 5, 2009 DC Wrk. Comp. Lexis 318 (Dec. 29, 2009).

**13.** District of Columbia Municipal Regulations provide that agency review panels are not bound by *stare decisis.* 7 DCMR § 255.6 (2005) ("A Review Panel decision with respect to an issue constitutes persuasive authority for and with respect to, any subsequent Review Panel decision rendered addressing the same issue.")

The Board previously assumed that an "aggrieved party" could request reconsideration. *Gonzales*, 2007 WL 867067, at \*9, 2007 DC Wrk. Comp. Lexis 95, at \*28 ("[T]he reconsideration request is to be made either by a medical care provider directly, or by a party through the use of a medical report.") (dictum). Thus, the Board held in *Chaupis* that "[i]t is a requirement of [the UR] process that reconsideration be requested where a party wishes to contest the outcome of a review; failure to request such reconsideration renders the UR conclusion dispositive." 2008 WL 965886, at \*6, 2008 DC Wrk. Comp. Lexis 45, at \*18.

**14.** The Board explained that "[t]he statutory 'right to request reconsideration' is solely a right belonging under the Act to the physician (a right that he/she would not otherwise have, given that the UR process is a statutory creation in a workers' compensation adjudication system to which the physician is not a direct party)." *McCormick*, 2009 WL 345799, at \*5, 2009 DC Wrk. Comp. Lexis 11, at \*14. It "view[ed] the subsection as giving the physician the right to request reconsideration if he/she wants to advocate for the patient, or if he/she wants to assist in getting a Compensation Order in order to receive payment for a procedure already undertaken, if he/she wishes to assist in getting authorization for a procedure before undertaking to perform it so as to not risk performing it and not getting paid, or for some other purpose." *McCormick*, 2009 WL 345799, at \*5, 2009 DC Wrk. Comp. Lexis 11, at \*13. In this discussion, the Board likely had in mind the provisions of D.C.Code § 32–1507(b)(7): "Medical care providers shall not hold employees liable for service rendered in connection with a compensable injury under this chapter."

*mick*, 2009 WL 345799, at *5, 2009 DC Wrk. Comp. Lexis, at *13. The Board therefore clarified "that the final step in the statutory [UR] process insofar as the parties [the claimant and the employer] are concerned is the UR report." *McCormick*, 2009 WL 345799, at *5, 2009 DC Wrk. Comp. Lexis, at *14.

The Board's clarification of the Act in this case is reasonable in light of the statute's purpose and its plain language. The statute does not explicitly address whether a physician's failure to request reconsideration could extinguish a claimant's right to apply for a formal hearing: although the provision for a hearing (§ 32–1507(b)(6)(D)) immediately follows the provision allowing the medical care provider to request reconsideration (§ 32–1507(b)(6)(C)), it does not refer to or mention reconsideration. This omission creates ambiguity which an agency charged with administering a statute may resolve. Moreover, the statute is not silent with respect to a claimant's right to seek a formal hearing: the Act unambiguously and plainly gives the claimant, as well as the employer and the medical care provider, the right to contest a utilization review determination before the agency. D.C.Code § 32–1507(b)(6)(D); *see Chaupis*, 2008 WL 965886, at *5, 2008 DC Wrk. Comp. Lexis 45, at *15 ("it is established that ... a formal hearing is available to resolve a dispute that remains following the UR process"). Finally, according to the plain language of the statute, only the medical care provider "shall have the right to request reconsideration of the opinion by the utilization review organization or individual. . . ." D.C.Code § 32–1507(b)(6)(C).

■ Rather than permitting a medical care provider's inaction to deprive a claimant of his or her right to an agency hearing, the Board now allows a claimant to seek a hearing even if the medical care provider has not sought reconsideration: "the UR process is complete, for the purposes of obtaining a formal hearing by the claimant or employer, upon obtaining the initial UR report." [15] This interpretation is not plainly wrong, unreasonable, or inconsistent with the plain language of the statute, and we will not disturb it. *Watergate East*, 953 A.2d at 1043.

## V. Conclusion

The judgment of the Compensation Review Board is hereby

*Affirmed.*

---

15. We observe that the Board's interpretation would in some cases permit a claimant or employer to proceed to a formal hearing contesting the UR report before the sixty-day window in which the medical provider may seek reconsideration has closed. Indeed, that is what happened here—the UR report was issued on September 19, and the formal hearing took place on October 2. We see nothing in the statute that precludes this result. If the medical provider seeks reconsideration, however, it would be important for the ALJ to consider the results of that process. The Board has sensibly remarked (in dictum) that if a medical care provider requests reconsideration within the sixty-day period, an ALJ should hold a formal hearing in abeyance "pending the results of that reconsideration." *Yates v. The Washington Times*, CRB No. 08–195, 2009 WL 345802, at *4, n. 5, 2009 DC Wrk. Comp. Lexis 10, at *10, n. 5 (Jan. 30, 2009).