# District of Columbia
# Court of Appeals



FILED

FEB **18** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

**No. 14-CV-860**

WILLIAM H. DUPREE,

                                        Appellant,

    v.                                                          **CAP-1495-13**

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS and
        DISTRICT OF COLUMBIA OFFICE OF EMPLOYEE APPEALS,
                                        Appellees.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE:  Glickman and Thompson, Associate Judges; and Nebeker, Senior Judge.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the decision of the Office of Employee Appeals, upholding appellant's release pursuant to the 2001 reduction-in-force, is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: February 18, 2016.

Opinion by Associate Judge Stephen H. Glickman.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CV-860

WILLIAM H. DUPREE, APPELLANT,

V.

DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS AND
DISTRICT OF COLUMBIA OFFICE OF EMPLOYEE APPEALS, APPELLEES.

FILED 2/18/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAP-1495-13)

(Hon. Brian F. Holeman, Trial Judge)

(Argued November 5, 2015     Decided February 18, 2016)

*James F. Wallington* for appellant.

*Holly M. Johnson*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellees.

Before GLICKMAN and THOMPSON, *Associate Judges*, and NEBEKER, *Senior Judge*.

GLICKMAN, *Associate Judge*: As part of a mandated reduction-in-force (RIF), the District of Columbia Department of Corrections (the Department) released William H. Dupree from his employment as a criminal investigator in

August 2001. Dupree's first appeal of that decision eventually reached this court, and we remanded the case to the Office of Employee Appeals (OEA) for its interpretation of the RIF regulations[1] and an evidentiary hearing on certain of Dupree's claims.[2]

On remand, an OEA administrative judge took evidence and again upheld Dupree's separation in the RIF, and the Superior Court affirmed that decision. Dupree appeals once more to this court. He argues that the OEA judge erred in interpreting and applying the RIF regulations. For the following reasons, we disagree and affirm the OEA decision.

## I.

Appellant was released from his employment as a criminal investigator with the Department on August 3, 2001, in one of several RIFs connected with the closing of the District's correctional facilities in Lorton, Virginia. The Department

---

[1] 6B DCMR § 2400 et seq. (2000) (Chapter 24 of the District of Columbia Personnel Manual). We cite to these regulations as they were in effect at the time of the 2001 RIF. The regulations have been modified since then, but not significantly so for present purposes.

[2] *Dupree v. District of Columbia Office of Emp. Appeals*, 36 A.3d 826 (D.C. 2011) (*Dupree I*).

abolished several hundred positions in this RIF, including five of its ten criminal investigator positions.

Under the provisions of the Comprehensive Merit Personnel Act (CMPA)[3] pertaining to RIFs and the regulations in effect in 2001, government employees subject to a RIF had the right to a single round of lateral competition for remaining positions within the employee's competitive level.[4] The competition was seniority-based: For each competitive level, the District of Columbia Office of Personnel (DCOP) determined "retention standings" by assigning each competing employee a "service computation date" (SCD) based on length of government service with credits for District of Columbia residency, prior military service, and outstanding performance.[5] The credit for outstanding performance is the only one at issue in this case. An employee who, at the time of a RIF, had received a "current performance rating" of "outstanding" was credited with four years of additional service.[6] The term "current performance rating" was defined to mean

---

[3] D.C. Code §§ 1-624.01–624.09 (2012 Repl.).

[4] *See id.* § 1-624.02 (a)(2); 6B DCMR § 2408.1.

[5] 6B DCMR § 2415.3 (c). The role of the DCOP is now performed by the District of Columbia Department of Human Resources.

[6] *Id.* § 2416.1.

"the performance rating for the year which ended on the March 31 preceding the date of the reduction-in-force notice,"[7] and for the credit to be available, "the performance rating must have been officially acted upon with all the necessary approvals [and] received in the appropriate personnel office" no later than thirty days before the RIF notice is issued.[8] The regulations specified that a performance rating received after that date "shall not change the employee's retention standing."[9]

The competing employees were ranked by their SCDs in a "retention register" used to identify the employees who would be released from service due to the abolishment of their positions. Employees selected for separation in the RIF were given thirty days' written notice of the effective date of their release.[10] The notices also informed the released employees of their rights, which included the rights to inspect records pertaining to their cases and to appeal.[11]

---

[7] *Id*. § 2416.2.

[8] *Id*. § 2416.3.

[9] *Id.* § 2416.4.

[10] *Id*. § 2422.1.

[11] *Id.* § 2423.1.

The RIF in which appellant was released was authorized by the Mayor in May 2001. Appellant and nine other criminal investigators "competed" for the five remaining criminal investigator positions. That is to say, the DCOP generated a retention register, ranking the criminal investigators by their SCDs in order to identify the employees who would be released from service. The DCOP issued the criminal investigator retention register on June 27, 2001. Based on his SCD, appellant was ranked eighth out of ten and hence was slated for release. He received notice on June 28 that the effective date of his separation would be August 3, 2001.

He appealed. In *Dupree I*, we directed the OEA on remand to construe the regulations governing two of appellant's contentions and provide him with an evidentiary hearing on them. Each contention was a challenge to appellant's ranking in the retention register.

First, appellant argued that the Department should have revised the June 27 register to reflect the voluntary retirements of three criminal investigators after the register was issued and before the RIF effective date.[12] The retiring investigators

---

[12] In its brief in this court, the District represents that one of the retirements actually did not take effect until after the effective date, which, if true, might mean

*(continued ...)*

all were ranked ahead of appellant, and one of them was ranked in the top five, so if the Department had issued a new retention register excluding all three retirees, appellant would have ranked fifth instead of eighth and would not have been released in the RIF. Instead, by not revising the register, the Department effectively left one of the five retained criminal investigator positions unfilled even as it separated Dupree and two other investigators. In remanding for further consideration of appellant's argument, we noted that the CMPA and the RIF regulations were "silent regarding the effect, if any, of retirements on the RIF procedures," and that when confronted with such silence, we look "in the first instance" to the administrative agency charged with administering the law to interpret its requirements.[13]

Second, appellant argued that the Department violated the RIF regulations by using prior-year performance ratings, instead of current-year ratings, to adjust the criminal investigators' SCDs, while simultaneously denying him a service credit for his own "outstanding" prior-year rating. The Department used the

_____

*(continued)*

the retirement did not create a vacancy appellant could have filled. However, because this information was not provided to the administrative judge, and is based on evidence *dehors* the record, we do not rely on it.

[13] 36 A.3d at 834 (internal quotation marks omitted).

performance ratings for the prior year (i.e., for the year ending March 31, 2000) because the current-year ratings (for the year ending March 31, 2001) were not properly approved and received before the thirty-day deadline set by the regulations. Appellant was not credited for his "outstanding" prior-year rating because he had been a criminal investigator for only nine months that year. Because the RIF regulations were "silent as to what happens when the current year's performance ratings have not been completed prior to the RIF," we directed the OEA in *Dupree I* to determine on remand whether the regulations permitted use of the prior year's ratings in that situation.[14] We noted that appellant's ranking in the retention register would not change if the prior-year ratings were not utilized.[15] But if it was proper to use the prior-year ratings, then, we held, appellant should have been given credit for his "outstanding" rating that year, which could improve his ranking by one position.[16]

---

[14] *Id*. at 834–35.

[15] *Id.* at 835 (explaining that appellant would "make[] no advancement in the ranking" if only current-year performance ratings could be applied, because "then no Criminal Investigator was entitled to an enhancement for an 'outstanding' performance rating, since the current year's performance reviews had not been completed").

[16] *Id.*

On remand and after an evidentiary hearing, an OEA administrative judge again upheld appellant's release in the 2001 RIF. In construing the RIF regulations, the judge relied, in part, on the testimony of Lewis Clark Norman, who was employed by the District government in the Department of Human Resources as a Human Resource Specialist in Classification. The judge found Mr. Norman qualified to testify as an expert on the subject of District of Columbia government personnel policies and RIFs. Accepting Mr. Norman's explication of the regulations, the judge concluded that when a position in a retention register is vacated by a retiring employee between the announcement of a RIF and its effective date, the regulations leave it to the agency's discretion whether to allow another competing employee (who otherwise would be released in the RIF) to fill the vacancy. Based on Mr. Norman's testimony and the other evidence before him, the judge held that the Department did not violate the law or abuse its discretion in this case by leaving the positions of the three retiring criminal investigators unfilled instead of moving appellant (and other employees) up in the ranking.

In line with the expert testimony, the judge also concluded that the RIF regulations precluded the Department from using the prior-year performance ratings to adjust the criminal investigators' SCDs. However, in agreement with

our analysis in *Dupree I*, the judge ruled that the error did not entitle appellant to relief because even if the register were reissued with no competing investigator receiving a performance rating credit, appellant would still occupy one of the positions eliminated in the RIF.

After the Superior Court affirmed the administrative judge's decision,[17] appellant sought timely review in this court.

## II.

As we set forth in *Dupree I*, we review agency decisions on appeal from the Superior Court the same way we review administrative appeals that come to us directly.[18] "Thus, in the final analysis, confining ourselves strictly to the administrative record, we review the OEA's decision, not the Superior Court's, and we must affirm the OEA's decision so long as it is supported by substantial

---

[17] Appellant did not appeal the judge's ruling to the OEA Board. That ruling therefore became a final decision of the OEA suitable for appeal to the Superior Court. *See* D.C. Code § 1-606.01 (d).

[18] 36 A.3d at 830 (citing *Johnson v. District of Columbia Office of Emp. Appeals*, 912 A.2d 1181, 1183 (D.C. 2006)).

evidence in the record and otherwise in accordance with law."[19]  Questions of law, including questions regarding the interpretation of a statute or regulation, are reviewed *de novo*.[20]  Although we routinely "accord great deference to an agency's interpretation of its own regulations or of the statute which it administers" when there is an ambiguity to be resolved,[21] neither party argues that we should defer to the administrative judge's interpretation of the RIF regulations in his decision below—an interpretation not reviewed and validated by the OEA Board on intra-agency appeal.[22]

---

[19] *Settlemire v. District of Columbia Office of Emp. Appeals*, 898 A.2d 902, 905 n.4 (D.C. 2006), quoted in *Dupree I*, 36 A.3d at 830–31.

[20] *Dupree I*, 36 A.3d at 831 (citing *District of Columbia v. District of Columbia Office of Emp't Appeals*, 883 A.2d 124, 127 (D.C. 2005)).

[21] *Fort Chaplin Park Assoc. v. District of Columbia Rental Hous. Comm'n*, 649 A.2d 1076, 1079 (D.C. 1994) (internal quotation marks omitted); *see also Nunnally v. District of Columbia Metro. Police Dep't*, 80 A.3d 1004, 1010 (D.C. 2013) ("Where we determine that a statutory term is ambiguous, however, we must defer to an agency's interpretation of that ambiguity that is reasonable and not plainly wrong or inconsistent with the legislature's intent."); *Children's Nat'l Med. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 403, 412 (D.C. 2010) (noting that a statutory "omission [may] create[] ambiguity which an agency charged with administering a statute may resolve"); *Dupree I*, 36 A.3d at 834.

[22] The District argues that we should defer to its expert witness's testimony regarding the DCOP's understanding of the RIF regulations.  We decline to do so with regard to the central and dispositive issue we discuss in this appeal (the retirement issue), for while Mr. Norman testified about DCOP's practices, he did not establish that the DCOP engaged in the kind of reasoned analysis that justifies judicial deference and that we envisioned when we remanded this case in *Dupree I*,

*(continued …)*

## A. Voluntary Retirements During the RIF Process

We begin with the OEA administrative judge's determination that the Department permissibly left unfilled the open positions in the retention register created by the voluntary retirements of three criminal investigators after the register was issued. Appellant objects to this determination for three reasons. First, he argues that the CMPA and the RIF regulations require agencies to move lower-ranking employees up into positions vacated by voluntary retirees so as to minimize the impact of the RIF. Second, he argues that even if agencies generally may be permitted to leave such vacated positions unfilled, the Department was under an obligation to revise the retention register to fill them in this instance by

_____

*(continued)*
36 A.3d at 834. *See Wash. Hosp. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 789 A.2d 1261, 1264 (D.C. 2002) (explaining that, to receive deference, "agency interpretations must reflect the careful legal and policy analysis required in making choices among several competing statutory interpretations, . . . and the record must provide evidence that the agency considered the language, structure, or purpose of the statute when selecting an interpretation." (internal quotation marks omitted)); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166–67 (2012) ("[D]eference [to an agency's interpretation of its own ambiguous regulations] is [] unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question.") (internal citations and quotation marks omitted); *Euclid St., LLC v. District of Columbia Water and Sewer Auth.*, 41 A.3d 453, 460 n.8 (D.C. 2012) (declining to defer to statutory and regulatory interpretations advanced by an agency solely in its pleadings and briefs during litigation).

virtue of its commitments to the Mayor and to union officials.  Third, appellant argues that even if the Department had discretion to leave the vacancies unfilled, it exercised its discretion improperly.  We address these contentions in order.

To begin with, as we recognized in *Dupree I*, the CMPA and the RIF regulations do not specifically direct how an agency should handle voluntary retirements occurring during a RIF following the statutorily required round of lateral competition that culminates in the issuance of a retention register.[23]  At a more general level, however, the statute and regulations tend to support the OEA administrative judge's conclusion that whether to fill the vacated slots with lower-ranking employees who otherwise would be released in the RIF is a question committed to the agency's discretion.  The regulations provide that "an agency *may*, within its budget authorization, take appropriate action, prior to planning a reduction in force, to minimize the adverse impact on employees" by "[r]eassigning employees to vacant positions which have been determined to be essential to the continued maintenance of the agency's operation."[24]  The regulations further state that "[p]ersonnel authorities and agencies *may*, in order to

---

[23] 36 A.3d at 834.

[24] 6B DCMR § 2403.2 (emphasis added).

minimize the adverse impact of a reduction in force, offer a released employee a vacant position for which he or she qualifies."[25] The administrative judge construed the word "may" in these provisions to confirm that an agency is permitted to move lower-ranking employees into slots that open in a retention register due to voluntary retirements, but is not required to do so. This is a reasonable implication to draw from the cited provisions.[26] It comports with the general prerogative of management to determine the number, types, and grades of positions of agency employees.[27]

---

[25] *Id.* § 2405.2 (emphasis added).

[26] *See, e.g.*, *Fraternal Order of Police, Metro. Police Dep't Labor Comm. v. District of Columbia*, 52 A.3d 822, 827–28 (D.C. 2012) (holding that the word "may" rendered an attorney's fees provision "expressly permissive"); *In re J.D.C.*, 594 A.2d 70, 75 (D.C. 1991) (observing that the word "may," used in a statutory context, is "quintessentially permissive"); *Trice v. United States*, 525 A.2d 176, 187 (D.C. 1987); *Bell v. Westinghouse Elec. Corp.*, 507 A.2d 548, 557 (D.C. 1986).

[27] *See* D.C. Code § 1-617.08 (a)(5) (2014 Repl.) ("The respective personnel authorities (management) shall retain the sole right . . . [t]o determine . . . [t]he number, types, and grades of positions of employees assigned to an agency's organizational unit, work project, or tour of duty."). (We quote the current statute, which reflects nonsubstantive alterations that were made subsequent to appellant's release from service by the Labor Relations and Collective Bargaining Amendment Act, D.C. Law 15-334 (Jan. 19, 2005)).

In the proceedings before the OEA, the Department and its expert witness explained why an agency has such discretion when an employee, who encumbers a position not scheduled for abolishment, voluntarily retires before a RIF is fully implemented. In lieu of filling the vacancy with an employee in the same competitive level who otherwise would be released in the RIF, management may deem it in the agency's best interest to (1) leave the vacated position unfilled in order to seek authorization to abolish the position, as the RIF regulations expressly allow[28]; (2) fill the vacancy after the RIF by allowing competition for it from a wider pool of applicants whose positions were abolished in the RIF; or (3) use the position vacancy in another program area of the agency. Appellant has not argued that these alternative courses of action are precluded by the CMPA or the RIF regulations. We need not decide whether they all are permissible; we think it enough to say that the action the Department did take—leaving the vacancies unfilled—is not precluded. Appellant argues that this amounts to approving of "unlimited agency discretion" in responding to an opening and is "inimical to the principle of merit competition" embodied in the CMPA.[29] But that surely is

---

[28] *See* 6B DCMR § 2405.8 ("During a reduction in force, the agency, with the approval of the personnel authority, may increase or decrease the number of positions previously identified for abolishment.").

hyperbole; the overall seniority- and merit-based character of the round of lateral competition in a RIF is scarcely altered by allowing a discretionary response by the agency in the occasional and limited situations created by voluntary retirements in the thirty-day notice period following the competition.

Arguably, moreover, requiring agencies to generate new retention registers whenever there are material changes in the competing employees' circumstances during the thirty-day notice period would tend to disrupt and delay the RIF process and create administrative burdens. As examples of what could happen, the District posits that "[a]n employee served a separation notice might hesitate to take steps needed to protect his interests; an employee with no residency credit might quickly move into the District to improve his position on the retention register; and a less senior employee might pressure a senior employee to retire so he can compete for the vacancy."[30] Such concerns, which cannot be dismissed out of hand, lend additional support to the interpretation of the RIF regulations endorsed by the OEA

_____

*(continued)*

[29] *See generally* D.C. Code § 1-624.02 (a).

[30] Brief for Appellees at 39.

administrative judge. The CMPA affords employees the right to "*one* round of lateral competition"—no more.[31]

Appellant argues that his claim of entitlement to a revised ranking in the retention register is supported by 6B DCMR § 2419.1. That section provides that "[t]he retention standing of each employee released from his or her competitive level shall be determined as of the date of release." Appellant did not mention § 2419.1 in the administrative proceedings on remand, however, even though the remand was meant to secure an informed analysis by the OEA of whether the RIF regulations required the Department to amend the retention register in response to voluntary retirements prior to the effective date of appellant's release. As a result, neither the District's expert witness nor the administrative judge addressed the applicability of § 2419.1. Under these circumstances, appellant must be held to

---

[31] D.C. Code § 1-624.02 (a)(2) (emphasis added). The issuance of a retention register is intended to be a final, appealable decision. D.C. Code § 1-624.04 provides that an employee who has been notified he will be released in a RIF may file an appeal with the OEA if he believes the agency has incorrectly applied the statutory provisions and regulations governing RIFs. "An appeal must be filed no later than 30 calendar days after the effective date of the action. The filing of an appeal shall not serve to delay the effective date of the action." *Id.*

have forfeited his argument based on that section by failing to raise it before the OEA on remand.[32]

But even if we were to relieve appellant of his forfeiture,[33] we are not persuaded by appellant's interpretation of the section. His argument that § 2419.1 requires agencies to update or reissue retention registers in response to events that take place during the notice period—despite the conspicuous absence of any language to that effect—ignores the fact that the statutory right to a single round of competition has been satisfied once the register is generated. As we read § 2419.1, it requires each employee's SCD, and therefore his or her retention standing, to be determined by reference to the RIF effective date (which is the date of release for

---

[32] *See Goodman v. District of Columbia Rental Hous. Comm'n*, 573 A.2d 1293, 1301 (D.C. 1990) ("In the absence of exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative agency at the appropriate time.").

[33] *See id.* at 1301 n.21 ("We agree . . . that a reviewing court has discretionary authority to consider issues which have not been raised before the agency. We join the federal courts in holding, however, that this authority should be exercised only in exceptional circumstances to avoid manifest injustice."); *cf. Tindle v. United States*, 778 A.2d 1077, 1082 (D.C. 2001) ("[T]he Supreme Court of the United States and this court have distinguished between 'claims' and 'arguments,' holding that although 'claims' not presented in the trial court will be forfeited (and thus subject to the plain error review standard), parties on appeal are not limited to the precise arguments they made in the trial court.") (internal quotation marks omitted).

separated employees) when the register is generated. Presumably, then, pertinent events that are certain to occur prior to the effective date—for example, a scheduled mandatory retirement—should not be disregarded. But it would be highly impractical to require that an agency look into the future when generating the register and try to account for subsequent events that are uncertain and beyond its control—such as anticipated voluntary retirements that have not yet occurred when the register is issued and that might be rescinded prior to the RIF effective date or delayed until after it. Thus, even were we to resurrect appellant's forfeited argument, we would remain unconvinced that § 2419.1 lends any support to his claim.[34]

Appellant alternatively argues that the Department in effect limited the ambit of its discretion by committing to the Mayor and in collective bargaining that

---

[34] The District argues for a narrower interpretation in its brief. Emphasizing that § 2419.1 addresses the retention standing of the "released" employee, the District argues that the section does not speak to the initial competition for retention standing at all, but merely establishes the effective date for determining retention standing in the event an employee is found to have been released due to an error in the register. This argument finds some support in § 2419.2, which provides that "[w]hen the personnel authority discovers an error in the determination of an employee's retention standing, it shall correct the error and adjust any erroneous reduction-in-force action in accordance with the employee's true retention standing as of the effective date established under this section." We need not decide whether the District's interpretation of § 2419 is correct, though if it is, it rebuts appellant's claim.

it would fill openings in the retention register when they arose in the 2001 RIF. However, the record does not support this argument. Appellant cites the May 10, 2001, memorandum in which the Director of the Department requested the Mayor's authorization to implement the RIF (which the Mayor gave). The memorandum noted that the Department's earlier reassignment of staff to funded vacancies in order to maintain security would "minimize[] the number of incumbent positions actually slated for the RIF." But neither this statement nor anything else in the memorandum purported to commit the Department to fill retirement-related vacancies occurring during the RIF, or otherwise to limit the Department's discretion with respect to such vacancies.

Appellant also sought to testify in the OEA proceeding on remand about an agreement between the Department and his union, the Fraternal Order of Police/Department of Corrections Labor Committee (FOP/DOC). Appellant was the Chairman of the FOP/DOC in the period leading up to the 2001 RIF. The extent of his proffer (as stated at the hearing by his counsel) was that the Department had agreed with the union that "funded vacant positions would be filled by persons that would otherwise be affected by this reduction in force, in order to retain . . . sufficient personnel to complete the agency's mission." Appellant did not proffer the putative agreement itself, or any other witnesses who

professed to be aware of it, or any details as to when, how, or by whom the agreement supposedly was made.[35] When the relevance of his proposed testimony about this agreement was questioned, appellant argued that the agreement bore on whether the Department retained discretion with respect to filling vacancies because the RIF regulations provided that, "[t]o the extent inconsistent with the provisions of a collective bargaining agreement, this chapter [governing RIFs] shall not apply to employees covered by such agreement with respect to the specific inconsistencies."[36] The administrative judge excluded testimony on this subject as being outside the scope of the issues properly before him. Appellant claims this ruling was in error.

Assuming *arguendo* that the existence of such a collective bargaining agreement would have been relevant, we must examine whether appellant sufficiently proffered that he could present probative evidence of such an agreement. As we have indicated, his proffer was vague. It failed to show that appellant's testimony would have been specific and detailed enough to establish

---

[35] Another witness called by appellant, a human resources specialist in the District's Office of Personnel who was involved in the RIF preparations, recalled having participated in meetings between the Office and the union, but she did not recall an agreement of any kind.

[36] 6B DCMR § 2402.2.

that the Department had entered into a collective bargaining agreement, or any kind of binding agreement with FOP/DOC, obligating it to fill vacancies created in the retention register by voluntary retirements during the thirty-day notice period. What the putative agreement actually required depends on its exact terms, which appellant did not purport to recount.[37] Moreover, it is significant that appellant did not proffer for inspection the agreement itself, which would have been the best evidence of its terms. As the District argues, under the best evidence rule, appellant's testimony would not have been sufficient to establish the terms of the alleged agreement because appellant did not provide an explanation for its absence.[38] If there was an agreement limiting the Department's discretion in the

---

[37] Given the generality of the proffered testimony, it may be there was nothing more than an informal and non-binding understanding that the Department would seek to fill vacancies in order to retain "sufficient personnel" to fulfill its mission; or, if there was an actual, binding agreement, that it allowed the Department to exercise its discretion not to fill a vacancy under some circumstances or for valid reasons. An agreement plausibly might have applied to the preparations for the RIF and the establishment of the various competitive levels, but not to vacancies arising in the thirty-day notice period after the issuance of each retention register and the lateral competitions at each level.

[38] *See Abulqasim v. Mahmoud*, 49 A.3d 828, 837 (D.C. 2012) ("The best evidence rule requires that when the contents of a writing are to be proved the original must be produced unless its absence is satisfactorily explained. . . . Secondary evidence of the contents of the writing is admissible on proof that the original is lost.") (quoting *Walker v. United States*, 402 A.2d 813, 813–14 (D.C. 1979)).

manner appellant asserts, it was incumbent on appellant to produce it or justify his failure to do so.[39]

Curiously enough, appellant actually proffered documentary evidence *belying* the existence of the agreement he alleges. This was a Report and Recommendation submitted by a hearing examiner on March 21, 2002, to the Public Employee Relations Board concerning unfair labor practice complaints by FOP/DOC against the Department of Corrections.[40] According to the report, the union complained that the Department had failed to bargain collectively in good

---

[39] We recognize that the administrative judge would have had discretion to relax the requirements of the best evidence rule had he been given sufficient reason to do so. *See id.* ("A reasonable discretion is vested in the trial court in the application of the best evidence rule.") (quoting *Walker*, 402 A.2d at 814); *see also Comm. for Wash.'s Riverfront Parks v. Thompson*, 451 A.2d 1177, 1184 (D.C. 1982) (noting the rules of evidence are "subject to more flexible application in the context of administrative proceedings"). But appellant did not give the judge any reason to relax the rule. Indeed, we think it would have been patently unfair to the District, and hence an abuse of discretion, had the judge disregarded the best evidence rule and relied on appellant's self-interested and unverified testimony that an agreement appellant inexplicably failed to produce for inspection bound the Department to revise the retention register. *See Goon v. Gee Kung Tong, Inc.*, 544 A.2d 277, 283 (D.C. 1988) (citing *Roberts v. United States*, 508 A.2d 110, 112 (D.C. 1986)) (holding that secondary proof of the contents of a document is permissible only if proponents can "show that [the] primary source material was unavailable through no fault of their own").

[40] We note that according to the hearing examiner, the union was represented by appellant's counsel in the instant case.

faith with respect to the impact and effects of the RIFs implemented in connection with the closing of the Lorton correctional complex, including the 2001 RIF that is the subject of this appeal. FOP/DOC did not complain that the Department violated any agreement with the union by failing to fill vacancies in the retention register created by voluntary retirements during the RIF. Rather, FOP/DOC complained, *inter alia*, about the Department's *failure to agree* to a union proposal, submitted on June 4, 2001, providing that employees could volunteer to be released from their competitive level and retired from government service. The hearing examiner found that the Department reasonably rejected this proposal on the ground that it was contrary to law and not an appropriate subject of bargaining. In other words, it appears the union acknowledged and the hearing examiner found that there was no agreement covering vacant positions in a retention register due to voluntary retirements.

On the record before us, we conclude that appellant has not established that he was prevented from presenting credible evidence of a collective bargaining agreement requiring the Department to fill retention register vacancies resulting from mid-RIF retirements.

Finally, appellant contends that the Department's decision not to allow him to compete for the retirement-related vacant positions in the retention register was not a proper exercise of whatever discretion the Department possessed. This contention also is premised on the notion that the Department was under a legal duty to mitigate the effects of the RIF, which it could have done by allowing employees scheduled for release to compete for retained positions vacated by retirements during the thirty-day notice period. As we have discussed, however, appellant has not shown that the Department was under a legal duty to mitigate. To be sure, an agency is required to correct errors in a retention register.[41] But the subsequent voluntary retirement of employees who still held their positions at the time the register was issued, i.e., voluntary retirements after the round of lateral competition is over and termination notices have gone out to affected employees, does not mean the register contained an error for the agency to correct.[42]

---

[41] *See* 6B DCMR § 2419.2.

[42] To the extent that appellant is claiming he effectively was denied his statutory right to "one round of lateral competition," D.C. Code § 1-624.02 (a)(2), we reject the claim. Appellant was afforded the right to compete for one of the remaining criminal investigator positions when the retention register was generated. At that time, all those positions were filled. It might be argued that the Department had foreknowledge of the upcoming retirements and therefore should have taken them into account when it generated the register. But as explained above, that would have been infeasible, because the Department had no guarantee

*(continued …)*

In sum, we construe the CMPA and the RIF regulations as the OEA administrative judge construed them—as leaving it to agency discretion whether to fill vacancies in a retention register that are created by voluntary retirements after the register has been generated and the RIF notices have been issued. Appellant has not demonstrated that the Department exercised its discretion improperly or breached a collective bargaining agreement or other binding commitment when it left the retirees' positions vacant in the 2001 RIF. Accordingly, we hold that appellant's lateral competition right was not violated by that action and it does not entitle him to relief.

## B.     The Use of Prior-Year Performance Ratings

The second issue on remand concerned the propriety of using prior-year performance ratings to determine retention standings. Appellant argues that the

_____

*(continued)*

that the voluntary retirements would take effect prior to the effective date of the RIF. Indeed, the District represents on appeal that the investigator occupying the second-ranked position in the register, a position in which he was protected from the RIF, did not retire until after the effective date. Moreover, the District claims, there is reason to believe another of the retirees (who was ranked ahead of appellant in one of the other positions to be abolished) would have rescinded his decision to retire had he been allowed to move up in the rankings to a vacated position protected from the RIF.

administrative judge's decision with respect to this issue was flawed in a number of respects, but it no longer matters given our resolution of the retirement vacancies issue. Regardless of how we might rule on this issue, appellant's retention standing would not improve enough to make a difference. Even if we were to disagree with the OEA and uphold the Department's use of prior-year performance ratings, there is no dispute that the four-year service credit appellant would receive for his "outstanding" prior-year rating would only move him from eighth to seventh place in the retention register. He still would occupy a position that was scheduled for abolishment (unless we also were to hold that he should have been allowed to compete for the retirees' positions, but we have rejected that claim). The performance rating issue thus is moot; to put it differently, any legal or factual errors the administrative judge may have made in addressing the issue were harmless and cannot entitle appellant to relief.[43]

---

[43] *See* 6B DCMR § 2405.7 ("The retroactive reinstatement of a person who was separated by a reduction in force under this chapter may only be made on the basis of a finding of a harmful error as determined by the personnel authority or the Office of Employee Appeals. An error to be harmful shall be of such a magnitude that in its absence the employee would not have been released from his or her competitive level."); *see also Harding v. District of Columbia Office of Emp. Appeals*, 887 A.2d 33, 34–35 (D.C. 2005) (applying the harmless error standard for a violation of the notice requirement in the RIF regulations).

## III.

For the foregoing reasons, we affirm the OEA's decision upholding appellant's release pursuant to the 2001 RIF.

*So ordered.*