## LINCOLN HOCKEY, LLC, et al., Petitioners,

v.

## DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.

**Jeffrey Brown, Intervenor.**

No. 02–AA–735.

District of Columbia Court of Appeals.

Argued May 29, 2003.
Decided Sept. 11, 2003.

---

Stewart S. Manela, Washington, DC, for petitioners.

Benjamin T. Boscolo, with whom Gerald Herz, Greenbelt, MD, was on the brief, for intervenor.

Arabella W. Teal, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel at the time, filed a statement in lieu of brief for respondent.

Before STEADMAN and GLICKMAN, Associate Judges, and NEBEKER, Senior Judge.

STEADMAN, Associate Judge:

Lincoln Hockey, LLC and its insurance carrier (hereinafter "the Capitals") appeal an award of workers' compensation benefits to Jeffrey Brown, a professional hockey player. Brown, who played for the Washington Capitals hockey team, was struck in the head and neck during a game. After a hearing at which conflicting medical evidence was introduced, the hearing examiner found that "chronic recurrent post-traumatic headaches" resulting from this impact prevented Brown from continuing to play professional hockey. This ruling was affirmed by the Director of the Department of Employment Services.

On appeal, the Capitals argue that the hearing examiner incorrectly gave "treating physician" preference to the testimony of Brown's chief medical witness, Kenneth M. Carnes, M.D., and that, in any event, there was no substantial basis for deferring to his testimony as controlling. The hearing examiner accepted Dr. Carnes as a treating physician without explanation. Furthermore, the hearing examiner, as we read the compensation order, rejected Dr. Carnes' medical conclusion that Brown suffered damage to his cervical discs which caused muscle spasms that led in turn to the headaches, and yet accepted Dr. Carnes' testimony that a medical causal relationship existed between the work injury and his present physical condition. We think the record requires further consideration and clarification in both respects and, accordingly, the compensation order and the Director's affirmance are vacated and the case is remanded to the agency for further proceedings not inconsistent with this opinion.

## I.

On April 6, 1998, while playing professional hockey for the Capitals in a game against the Montreal Canadiens, Brown's neck and head were struck by another player. He experienced pain in his head, neck, and arms and left the game. He asserted that since that date, he had experienced chronic and recurrent headaches that prevented him from skating at the extreme level required of him as a professional hockey player. He sought an award for total temporary disability from October 1, 1998 to the present and continuing. He also sought benefits for permanent partial disability for a fifteen percent loss of use and function of his left arm. The hearing examiner granted the claim for temporary total disability but denied the permanent disability claim. The Director in a brief order sustained this ruling. The Capitals filed a petition for review in this court.

The record before the hearing examiner contained a great deal of conflicting medical evidence. Brown consulted an unusually large number of medical experts following his injury in an apparent effort to identify the cause of and to find alleviation for his asserted problems. Following the incident on the hockey rink, Brown received emergency medical care and treatment from the employer's trainer and team doctor in the locker room after the game. On April 13, 1998, he was seen by Dr. Frank H. Anderson at his employer's request. Dr. Anderson stated that Brown's headaches were due to the April 6 trauma and should resolve in the near future. On May 7, 1998, after attempting to return to playing hockey, Brown returned to Dr. Anderson complaining of intense head pain, which was increased by activity. On July 23, 1998, Brown saw Dr. L.D. Sitwell in Ottawa (upon the referral of a Dr. Kissick), complaining of significant head pain, which increased with activity, namely attempts to return to playing hockey, as well as an episode of disorientation. Brown next saw Dr. George Cybulski, in connection with an inquiry from the Chica-

go Blackhawks regarding employment with that team. Brown complained of headaches for the five months following the episode. Dr. Cybulski opined that Brown was status post concussion on April 1, [sic] 1998,[1] that he had a normal MRI, and could return to his hockey career.

Brown then returned to his home in Raleigh, North Carolina, where he pursued treatment. He was first seen by Dr. David Cook, on November 3, 1998. Dr. Cook opined in a letter to a Dr. G. Hadley Callaway, apparently a referring physician, that Brown suffered from a "chronic post-traumatic headache, with minor trauma and no confirmatory signs" and that the headaches appeared to be tension type, but Dr. Cook did not rule out cervicogenic components, TMJ, and idiopathic intracranial hypotension.

Brown, still at home in North Carolina, then visited Dr. Kenneth M. Carnes, a board-certified neurologist and team physician for the Carolina Hurricanes hockey team, on February 16, 1999. Dr. Carnes was aware that Brown had undergone several normal MRI's and Brown told him about the hockey incident, to which Brown attributed his symptoms. Brown complained to Dr. Carnes of a headache that increased with activity, neck pain, and numbness in his arms. Dr. Carnes noted that Brown's head pain and numbness in the arms increased with neck movement and referred Brown for MRI and EMB/NCV studies. These showed evidence of a disc herniation at the C5/6 level with another small central disc herniation at the C6/7 level. Dr. Carnes attempted treatment with steroid injections, physical therapy, and drugs and referred Brown to a neurosurgeon, Dr. Robin Koeleveld, who advised against surgery. Dr. Carnes saw Brown a second time on May 10, 1999, and informed him that his chronic headaches

and neck pain were related to his underlying injury to the C6 nerve root. With the exception of a prelitigation examination on December 18, 2000, this was the only other visit of Brown to Dr. Carnes.

In the meantime, Brown had relocated to St. Louis, where, on the referral of Dr. Carnes, he saw Dr. Ralph Dacey, who performed examinations on September 10 and October 5, 1999. Dr. Dacey noted that there was minimal bulging of Brown's cervical discs and stated that the symptoms were consistent with either post-concussion syndrome or cervical strain syndrome.

Brown also saw two doctors selected by the Capitals as independent medical examiners. On October 7, 1999, Dr. Neal Kurzrok examined Brown, noting his chronic headaches and indicated that he suspected "stress/tension headaches or headaches related to cervical spine pathology though cannot absolutely rule out chronic posttraumatic headaches." Brown also saw Dr. Steven Scherping on October 8, 1999, who noted Brown's persistent headaches, which increased with vigorous exercise. He stated Brown had mild to moderate diffuse tenderness over his paraspinal musculature, but not centered on his cervical elements and had a mild pain with cervical flexion in his trapezial region bilaterally. Dr. Scherping said that it would be difficult to explain the type of headaches Brown had based on a cervical spine injury and would defer a further evaluation to a neurologist on the potential causes.

## II.

Before the hearing examiner, Brown's principal witness was Dr. Carnes, who testified through deposition. In particular, Dr. Carnes testified that Brown had a

---

1. Presumably April 6, 1998, the day of the incident at issue.

diagnosis of chronic daily headache and chronic neck pain, both secondary to underlying left C6 radiculopathy. He explained, in lay terms, that cervical nerve injury can produce local pain and muscle spasms in the neck, which then radiates to the skull and produces headaches.[2] Dr. Carnes expressed the view that Brown did not suffer from post-concussive syndrome, but rather his symptoms were caused by the injury to his spine. Carnes stated that, in his opinion, the hockey incident of April 6, 1998, caused the spine injury which in turn was responsible for his present physical condition that prevented him from engaging in professional hockey. The hearing examiner found that this testimony was sufficient to invoke the presumption that a medical causal relationship existed between the incident and his present physical condition. *See Whittaker v. District of Columbia Dep't of Employment Servs.*, 668 A.2d 844 (D.C.1995).

The Capitals then presented testimony of its independent medical expert, Dr. Kurzrok, who like Dr. Carnes was a neurologist. Dr. Kurzrok testified that although he could not rule out a post-traumatic headache theory, the absence of objective findings on diagnostic tests, coupled with the history of earlier trauma, led to the conclusion that claimant's condition and Dr. Carnes' opinion did not withstand expert medical scrutiny. Dr. Kurzrok expressed concern that Brown provided differing histories to his various physicians, leaving out other possible causes of his headaches.[3] The Capitals also argued that Brown suffers from other conditions likely to cause his headaches, including prior traumas and temporomandibular joint syndrome (TMJ), that several of the physicians noted other potential causes of Brown's headaches, and that Dr. Carnes stood alone in affirmatively stating that Brown was physically impaired from resuming his professional hockey career. From the Capitals' showing, the hearing examiner found that the presumption had been overcome and proceeded to weigh the conflicting evidence without any presumption as to causal connection.

The hearing examiner then weighed and discussed the conflicting evidence and eventually stated:

> While it is concluded that Dr. Carnes' opinion concerning damage to claimant's cervical discs and associated left arm radiculopathy is supported neither by meaningful objective findings nor claimant's own testimony concerning his extracurricular activities, his opinion [concerning] claimant's headaches-which began immediately following the April 6, 1998 incident and have persisted since then-is accorded greater weight than the opinion of employer's IME physician [Dr. Kurzrok]. On the totality of the evidence of record, there is no discernible reason to disregard the opinion of the treating physician as it relates both to the existence of claimant's injury and the relationship of his physical condition thereto. It is concluded the April 6, 1998 work incident resulted in the chronic, post-traumatic headaches experienced by claimant.

The hearing examiner then proceeded to examine the nature and extent of the dis-

---

2. Dr. Carnes also testified as to Brown's claimed permanent partial disability to his left arm, ascribing it to pain and weakness related to the disc injury but acknowledging that the disability was based solely on Brown's own statements.

3. The hearing examiner specifically found Brown to be a credible witness and characterized the variations in the history provided to doctors as attributable to inattention rather than deception.

ability. Again, he recited the rule that "it is equally well-settled that the medical opinion of claimant's treating physician(s) on the question of claimant's continuing physical impairment, if any, should be accorded great weight" and eventually concluded that the Capitals' evidence "is insufficient to justify disregarding the rule that the opinions of a claimant's treating physician are entitled to significant weight" and "therefore, it must be determined claimant is physically impaired from returning to his pre-injury job as a professional hockey player."

The Director's Decision upheld the Compensation Order, ruling that despite differences in the medical reports of Brown's history and condition there was not enough to find Brown's testimony[4] was incredible.

## III.

"When reviewing an agency decision on appeal, this court inquires: (1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings." *See Ferreira v. District of Columbia Dep't of Employment Servs.*, 667 A.2d 310, 312 (D.C.1995). The proper judge of credibility is the hearing examiner and an appellate court cannot substitute its judgment as to credibility for that of the hearing examiner. *Short v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 845, 851 (D.C.1998). The court will defer to the determination of the Director as long as the decision "flows rationally from the facts, and those facts are supported by substantial evidence in the record." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, No. 01–AA–877, 830 A.2d 865, 870 (D.C. 2003).

A principal problem we have with the record before us is our inability to reconcile the hearing examiner's rejection of Dr. Carnes' testimony "concerning damage to claimant's cervical discs" with his acceptance of Dr. Carnes' opinion that the head and shoulder impact caused the headaches, which in turn disabled Brown from resuming his professional hockey career. Dr. Carnes specifically rejected any post-concussion basis and instead relied solely on the theory that there was damage to the C6 spine area, causing muscle spasms which caused the headaches. No other physician supported this theory. After his statement rejecting Dr. Carnes' opinion concerning the damage to the cervical disc, the hearing examiner never mentions that fact again. Instead, it appears that the hearing examiner substituted a rather vague theory of "post-traumatic headaches," based perhaps on Carnes' preliminary diagnosis, which the hearing examiner quotes, and not the final diagnosis, which clearly relates solely to the C6 damage. Yet, having rejected Dr. Carnes' theory as to the cause of the headaches, the hearing examiner relies upon Dr. Carnes' ultimate conclusion as the "treating physician" that the headaches were caused by the April 6 hockey incident and prevent further professional hockey.

In his brief before us, Brown never addresses this anomaly, although the Capitals' brief squarely and forcefully raises it. At oral argument, Brown's counsel suggested that the apparent rejection was

---

4. Although the Director's Decision refers to "Brown's testimony," *i.e.*, there were not enough discrepancies "to find that claimant's testimony is not credible," we note that the Compensation Order was based on more than the testimony of Brown himself, leading us to interpret the phrase "Brown's testimony" as all the testimony offered by Brown in his case.

only to the claim that the cervical disc damage caused a partial disability to the claimant's left arm. It is difficult to reach such an interpretation of the hearing examiner's intent, given the failure ever to mention that injury in connection with the headaches and instead to repeatedly refer to the headaches in another manner. At a minimum, clarification is necessary. As the record now stands before us, we are unable to say that the decision flows rationally from the facts as found and is supported by substantial evidence.

## IV.

The Capitals also challenge the acceptance of Dr. Carnes as a "treating physician" entitled to preferential deference, plainly a crucial consideration in the hearing examiner's ultimate decision with respect to the conflicting medical testimony. Nowhere is any explanation given by either the hearing examiner or the Director as to the criteria that were appropriately employed in making this determination.

The principle of giving greater weight to the opinion of treating physicians in workers' compensation cases was first adopted by us in *Stewart v. District of Columbia Dep't of Employment Servs.*, 606 A.2d 1350 (D.C.1992). In reviewing a decision of the Director denying petitioner workers' compensation benefits, the court stated:

> Moreover, some courts have suggested, and we agree, that in assessing the weight of competing medical testimony in worker compensation cases, attending physicians are ordinarily preferred as witnesses to those doctors who have been retained to examine the claimant

solely for purpose of litigation. *See generally King v. W.C.A.B.*, 132 Pa. Commw. 292, 572 A.2d 845, 846 (Pa. Commw.1990), and authorities there cited.[5]

*Id.* at 1353.

The rationale for this preference for the testimony of treating physicians seems to be two-fold, in part because the treating physician was not involved solely for the purposes of litigation and thus perhaps is less apt, even if subconsciously, to be biased in making a diagnosis, and in part because of the typically greater amount of time the doctor has worked with the patient. *See, e.g., Cuppett v. Covington & Burling*, 1998 D.C. Wrk. Comp. Lexis 337, H & AS No. 96–563 OWC No. 293552, at *22, (Compensation Order, December 25, 1998) ("[t]his sensible rule has at its core the reasonable assumption that physician who has treated a patient numerous times over a number of weeks, months or years is likely to have a greater and more reliable insight into the condition of a patient than does a physician who has merely had only a very limited exposure to the patient."). Subsequently we added another prong to the "treating physician" doctrine; namely, that a hearing examiner may not reject the testimony of a treating physician without explicitly addressing that testimony and explaining why it is being rejected. *Canlas v. District of Columbia Dep't of Employment Servs.*, 723 A.2d 1210, 1212 (D.C.1999).

█ The case law does not directly define "treating physician," but instead appears to defines it by negation; treating "physicians are ordinarily preferred as wit-

---

5. All the cases cited in *King* are from Pennsylvania. In fact, "there appears to be no uniform practice regarding application of a treating physician rule under state workers' compensation statutes." *Black and Decker v. Nord*, —— U.S. ——, —— n. 3, 123 S.Ct. 1965, 1970 n. 3, 155 L.Ed.2d 1034 (2003). A number of states have rejected any such prefer-

ence. *See, e.g., Gooby v. Lake Shore Mgmt. Co.*, 136 Idaho 79, 29 P.3d 390, 397 (2001); *Diocese of Providence v. Vaz*, 679 A.2d 879, 882 (R.I.1996). The leading treatise appears to contain only a brief discussion of the principle. 8 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 130.05[4][b], at 130–41 (2003).

nesses to those doctors who have been retained to examine the claimant solely for the purposes of litigation." *Stewart,* 606 A.2d at 1353.[6] It is not entirely clear as to the precise nature of the "preference" to be given to the testimony of the treating physician, although plainly the hearing examiner is free to reject it with a proper explanation for doing so. *See Mexicano v. District of Columbia Dep't of Employment Servs.,* 806 A.2d 198, 205 (D.C.2002). In contesting the credibility or weight of a treating physician's opinion, the employer has the opportunity, before the hearing examiner, to question the factual foundation of the doctor's opinion, suggest that the doctor is unaware of the employee's medical history or otherwise challenge the factual basis of the treating physician's opinion; the hearing examiner takes such a challenge, in addition to competing medical opinions, into account when assessing the medical evidence and addressing whether the treating physician's opinion should be controlling. *See Safeway Stores v. District of Columbia Dep't of Employment Servs.,* 806 A.2d 1214, 1221–22 (D.C.

2002); *Olson v. District of Columbia Dep't of Employment Servs.,* 736 A.2d 1032 (D.C.1999).

The Capitals argue that the hearing examiner erred both in considering Dr. Carnes to be a "treating physician" within these principles and in giving undue weight to his testimony. The Capitals note that Brown only met with Dr. Carnes twice and was under his care for only a matter of months, beginning just short of a year after the April 6, 1998 hockey incident. Moreover the Capitals argue Dr. Carnes should not be relied upon because he admittedly did not know Brown's full history of head trauma, prior headaches and related symptoms, nor that Brown engaged in a variety of leisure sports activities following the injury.

As already indicated, the agency never addressed explicitly the treating physician issues in any significant respect.[7] Since the case is being remanded in any event, the agency will have an opportunity to do so and to explain its views of the criteria to be employed in determining who is a treating physician and the factors to be consid-

6. The cited case used the term "attending physician." The term "attending physician" is typically used to refer to the physician that the employee must designate under D.C.Code § 36–307(b)(3) (1981) (employee shall have the right to choose an attending physician to provide medical care). Under 7 DCMR 212–12 (1994), the employee may not change the designated physician without authorization from the carrier unless there is an emergency situation. *See Washington Hospital Ctr. v. District of Columbia Dep't of Employment Servs.,* 789 A.2d 1261 (D.C.2002). It appears, however, that the term "treating physician" is a more expansive concept than "attending physician," although we would defer to the Director's view on that question.

7. The treating physician rule has been discussed in several federal contexts. With regard to Social Security, the rule is set forth by regulation adopted in 1991. Every medical opinion will be weighed, but there is generally more weight given to opinions from treating sources, since they are most likely to be the "medical professional most able to provide a detailed longitudinal picture" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports from individual examinations." 20 C.F.R. § 404.1527 (2003). If it is found that the treating source's opinion is well-supported by medically acceptable clinical and laboratory evidence, the SSA will give it controlling weight. *Id.* In assessing the weight of the treating source, the SSA will look to: the length of the treatment relationship and frequency of examinations; the nature and extent of the treatment relationship; supportability of the opinion; consistency of the opinion both internally and with other opinions; and specialization of the physician. *Id. See* James A. Maccaro, *The Treating Physician Rule and the Adjudication of Claims for Social Security Disability Benefits,* 41 Soc. Sec. Rep. Serv. 833, 833–34 (1993).

ered in assessing preferentially such a physician's testimony as reflected in this case.[8]

Accordingly, the compensation order and the Director's affirmance are vacated and the case is remanded to the agency for further proceedings not inconsistent with this opinion.

*So ordered.*

The treating physician rule was specifically rejected in the ERISA context by the Supreme Court in *Black and Decker v. Nord, supra* note 5, —— U.S. at ——–——, 123 S.Ct. at 1969–70. The Court held that no such rule existed in ERISA law and such a rule would have to be adopted by the Secretary as it was by the Social Security Commissioner. Moreover the Court noted that critical differences between Social Security and ERISA demonstrated that the rule was not appropriately applied to ERISA; the treating physician rule was appropriate for efficient operation of the large and mandatory Social Security benefits system, but not to the diverse realm of employee benefit plans, which are not required by ERISA. *Id.* at 1971–72.

Under the Black Lung statutes, "an agency adjudicator may give weight to the treating physician's opinion when doing so makes sense in light of the evidence and the record, but may not mechanistically credit the treating physician solely because of his relationship with the claimant." *National Mining Assn. v. Dep't of Labor,* 292 F.3d 849, 861 (2002).

8. To be sure, the two issues are somewhat interrelated, but the threshold issue of defining a treating physician is important, given the preference rules. One might speculate which of the considerable number of other physicians that examined Brown might also be considered treating physicians whose opinions were implicitly rejected by the hearing examiner in adopting Dr. Carnes' views as controlling.