*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-0029

FILED **05/03/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

METRO FIRE PROTECTION, *et al.*, PETITIONERS,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, RESPONDENT,

and

MICHAEL GREEN, INTERVENOR.

On Petition for Review of an Order of the District
of Columbia Compensation Review Board
(CRB-117-16)

(Submitted December 12, 2017                    Decided May 3, 2018)

*Joseph C. Tarpine III* was on the brief for petitioners.

*Karl A. Racine*, Attorney General for the District of Columbia with whom *Todd S. Kim*, Solicitor General at the time the statement was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the statement was filed, filed a statement in lieu of brief, for respondent.

*David J. Kapson* was on the brief for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY, *Associate Judge*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*:  In this workers' compensation case, the employer-petitioner appeals a Decision and Order of the Compensation Review Board ("CRB") granting benefits for total temporary disability to an employee injured on the job.  The case concerns an employee on "light duty" work restrictions who unsuccessfully claimed compensation after his employer went out of business, but who was awarded compensation — the issue on appeal here — after being fired by his next employer.  For the reasons set forth below we affirm.

## I.  Factual Summary

This case concerns a 2015 injury suffered by the employee-intervenor, Michael Green, while he was working as a sprinkler fitter for the petitioner, Metropolitan Fire Protection Services ("Metro Fire").[1]  Before Green's employment at Metro Fire, he had suffered a workplace injury in Maryland on December 7, 2005, when he fell off a roof.  After the 2005 injury, Green underwent three neck surgeries and was found to be capable of working only at a "medium physical demand level."  Green's claimed compensation for this injury

---

[1]  The District of Columbia Department of Employment Services, which houses the CRB, is named as the respondent but declined to file a brief, preferring to "submit[] based on the [CRB's] order dated December 27, 2016."  Our factual summary is derived from the ALJ's Compensation Order.

was resolved by the Maryland Workers' Compensation Commission on December 12, 2013, after shepherding a $100,000 settlement.

Over a year later, on March 6, 2015, more than nine years after his 2005 injury, Green was working for Metro Fire with light duty restrictions when he slipped and fell, injuring his back, neck, and elbow. After receiving treatment, Green was cleared for return to his "usual duties" at Metro Fire, which continued to accommodate his light duty restrictions. When Metro Fire closed upon the owner's retirement in early April 2015, Green began collecting unemployment benefits. After leaving Metro Fire he was still able to work with light restrictions, but he remained unemployed while searching for another union job. On May 18, 2015, Green began working for SS&C,[2] again "within his work restrictions." On June 27, 2015, SS&C terminated Green's employment.[3] He was out of work until October 19, 2015, when he was employed by National Fire Protection.

---

[2] Green was not aware of the exact name of this company.

[3] Green initially testified that SS&C had terminated his employment because he was "missing too much" work for physical therapy and doctors' appointments; however, Green also testified that his supervisor had told him that, if he took a week's vacation, SS&C "might have to let [him] go." The ALJ found that Green had lost the job at SS&C because of the doctors' appointments, and the CRB accepted that finding.

On March 4, 2015, two days before his injury at Metro Fire, Green had seen Dr. Carey-Walter Closson, a pain management specialist at Concentra Medical Center, who had addressed Green's chronic back pain following the 2005 Maryland accident. Dr. Closson diagnosed Green's low back condition[4] and prescribed physical therapy and a surgical consult, among other medical options. After his March 6 injury, Green continued to work with light duty restrictions under the care of Concentra until August 6, 2015, when Dr. Benjamin Stein, an orthopedist with Concentra, recommended a Functional Capacity Evaluation, as well as an evaluation by either a neurosurgeon or an orthopedic specialist, because Green was experiencing "persistent left sided radiculopathy." Dr. Stein also prescribed light duty restrictions, precluding Green from "lifting over 20 pounds, pushing or pulling objects more than 30 pounds, [or] standing for more than one hour at a time."

On October 2, 2015, Green began seeing Dr. Joel Fechter, an orthopedic surgeon, complaining of pain in his neck, left arm, back, and legs. Dr. Fechter reviewed Concentra's records, noting Green's 2005 injury and his three subsequent

---

[4] According to the ALJ's Compensation Order, Dr. Closson diagnosed Green's condition as "lumbar degenerative disease at LA-5, L5-Sl; cervical post-laminectomy pain syndrome post C4-C7 ACDF; cervical and lumbar radiculitis; lumbar facet and SI joint arthropathy; and myofascial pain."

surgeries. He also noted that Green's "residual complaints" from his 2005 accident "had worsened since his March 6, 2015 accident." Dr. Fechter then diagnosed Green as having "cervical and lumbosacral spine strain injuries secondary to his fall at work on March 6, 2015." Dr. Fechter "gave [Green] a light duty work release with no lifting over 10 pounds." He also recommended a neurosurgical consultation with a Dr. Ammerman.

Four days later on October 6, 2015, at Metro Fire's request for an independent medical evaluation (IME), Green was examined by an orthopedic surgeon, Dr. Stuart Gordon, who examined Green and his "extensive medical records." In substantial disagreement with Dr. Fechter, Dr. Gordon concluded that Green had "suffered cervical and lumbar strains on March 6, 2015; [Green's] present complaints and medical treatment were unrelated to his work accident; and, [Green] could resume working within his pre-existing restrictions of bending, kneeling and a 30 pound lifting restriction." Dr. Gordon further opined that Green did not need "any further medical treatment related to his [Metro Fire] work injury and that any further treatment would be related to [Green's] pre-existing trauma and degenerative disease" dating back, apparently, to the 2005 injury.

Thereafter, in a letter of February 18, 2016, to Green's counsel, Dr. Fechter confirmed his diagnosis that Green suffered from "cervical and lumbosacral spine strain injuries." Although Dr. Fechter acknowledged that Green's cervical spine symptoms had "essentially resolved," he opined that Green's March 6, 2015, accident at Metro Fire had "caused the injuries and aggravated the pre-existing degenerative changes [from 2005] as well as the pre-existent condition in the neck." He continued Green on "light duty status with a ten pound lifting restriction."

## II. Administrative Proceedings

In an application for formal hearing filed on December 30, 2015, Green claimed workers' compensation attributable to his March 6, 2015, injury. During the proceeding before the ALJ, Green claimed temporary total disability from April 10, 2015, to May 18, 2015 (the end of his employment by Metro Fire to the date of employment by SS&C), and from June 27, 2015, to October 19, 2015 (the end of Green's employment by SS&C to the date he began working for his next employer.[5] Green also claimed compensation for out-of-pocket expenses, interest

---

[5] During Green's employment by National Fire Protection, he worked 48 hours a week subject to the work restrictions Dr. Fechter had prescribed.

on accrued benefits, and authorization for a neurosurgical consultation with Dr. Ammerman.

After a formal hearing, the ALJ issued its Compensation Order on August 26, 2016, concluding that: (1) Green had met his burden to show that his disability was "medically causally related to [the] March 6, 2015 work accident"; (2) Green had failed to prove that "he was temporarily and totally disabled from April 10, 2015, through May 17, 2015," as he had been laid off upon Metro Fire's closing; thus, the period of unemployment was "economic in nature," not a result of his disability; (3) Green had proved that "he was temporarily and totally disabled from June 27, 2015 through October 19, 2015 as a result of his March 6, 2016 accident," and thus was entitled to receive workers' compensation benefits for that period; (4) Green was entitled to a neurological consultation with Dr. Ammerman, as recommended by Dr. Fechter; (5) he was further entitled to mileage reimbursement for related doctor and physical therapy appointments; and (6) Metro Fire was entitled to a "credit for unemployment benefits received by [Green] from June 27, 2015 through October 19, 2015."

Green did not cross-appeal from the denial of benefits for the period from April 10, 2015, through May 17, 2015. In a Decision and Order of December 27, 2016, the CRB affirmed the ALJ's Compensation Order.

## III. Issues on Appeal

Metro Fire argues that the CRB erred in affirming:

1. The ALJ's exclusion of evidence regarding Green's December 2005 injury that resulted in a "documented permanent partial impairment" and subsequent "lump sum" settlement with the Maryland Workers' Compensation Commission;

2. The ALJ's finding that Green's low back "condition [was] medically causally related to the subject accident" (his work-related incident of March 6, 2015) while working for Metro Fire;

3. The ALJ's authorization of medical treatment requiring Metro Fire and its insurer to "present a Utilization Review to challenge the reasonableness and necessity" of the recommended neurological examination; and

4.  The ALJ's award of temporary total disability benefits to Green "for the period of June 27, 2015 through October 19, 2015," when Green should have been found out of work "because of economic factors" rather than disability.

## IV.  Standard of Review

This court's review is limited to the "decision of the CRB, not that of the ALJ."[6]  Although we review questions of law *de novo*, this court will overturn a CRB's final order only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[7]  "We will not disturb the agency's decision if it flows rationally from the facts which are supported by substantial evidence in the record."[8]

---

[6]  *Brown-Carson v. District of Columbia Dep't of Emp't Servs.*, 159 A.3d 303, 306 (D.C. 2017).

[7]  *Clark Constr. Grp., LLC v. District of Columbia Dep't of Emp't Servs.*, 163 A.3d 768, 773 (D.C. 2017) (quoting *Reyes v. District of Columbia Dep't of Emp't Servs.*, 48 A.3d 159, 164 (D.C. 2012)).

[8]  *Jones v. District of Columbia Dep't of Emp't Servs.*, 41 A.3d 1219, 1221 (D.C. 2012) (quoting *Washington Metro Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 683 A.2d 470, 472 (D.C. 1996)).

## V.  Analysis

### A. Maryland Workers' Compensation Claim Evidence

Metro Fire challenges the ALJ's decision to exclude from the record several exhibits its counsel proffered showing Green's compensation for his 2005 workplace injury:  a settlement for $100,000 before the Maryland Compensation Commission in 2013.  Counsel stresses the importance of determining whether Green's "current condition is related to the work accident in this case" or instead "to his prior injuries and prior conditions."  Thus, counsel sought admission of Green's Maryland claim documents, two physicians' reports (without objection), the hearing transcript, the "functional capacity evaluation" showing the "prior restrictions" on Green's work activity, and the settlement (including disability findings).

Green's counsel objected that the exhibits would be "prejudicial and not relevant," stressing that Maryland's functional capacity evaluation showed that the work restrictions imposed for the 2005 injury were "less restrictive" — merely a "medium physical demand level" — compared with the period "he's currently claiming disability for."  In reply, counsel for Metro Fire observed that Green's

counsel appeared to acknowledge that the Maryland evidence actually supported Green's position that since 2005 his "condition ha[d] worsened." Counsel for Metro Fire then emphasized the importance of having "all the evidence to consider what his prior condition was," especially because the Maryland evidence "establish[ed] a permanent disability that Mr. Green had even prior to this accident."

After this colloquy, the ALJ sustained Green's objections to admission of some, but not all, of the exhibits pertaining to the Maryland claim. In ruling for Green, the ALJ excluded the Maryland settlement documents (including disability findings) as either "prejudicial" or not "particularly relevant." On the other hand, ruling for Metro Fire, the ALJ allowed in evidence the notice of Green's Maryland claim, the entire transcript of the Maryland hearing (found relevant for Green's testimony "concerning his complaints" at the time), and the proffered functional capacity evaluation of the 2005 injury.

The CRB perceived no basis for "disturb[ing] the ALJ's exclusion of the evidence pertaining to . . . the settlement of [Green's] prior claim" in Maryland, mindful of the ALJ's obligation (as the CRB put it) not to exercise its "broad

discretion" in an "arbitrary or capricious fashion."[9] This court has observed that the administrative factfinder has discretion to exclude evidence, among other reasons, if it is "irrelevant" or its "probative value is substantially outweighed by the danger of unfair prejudice"[10] — reasons expressed by the ALJ, and confirmed by the CRB, as to the discretion exercised over admission of Metro Fire's proffered Maryland exhibits.

We find no basis for upsetting the CRB's affirmance of the agency's discretionary call here. Metro Fire achieved not only admission of the Maryland claim and the entire hearing testimony from that proceeding, but also admission of the functional capacity evaluation. All that Metro Fire was precluded from introducing, it would appear, was: (1) medical analysis of the 2005 injury, much of which was reflected in the records reviewed by the doctors whose evidence was taken in this case; and (2) the financial aspects of the Maryland settlement, not obviously relevant here. In sum, we perceive no abuse of discretion in the CRB's

---

[9] *See Washington Hosp. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 983 A.2d 961, 965 (D.C. 2009) (noting that admission of evidence is "in the discretion of the [ALJ]" and comparing the ALJ's "broad discretion in the admission or exclusion of expert testimony" to that of a trial judge).

[10] *Dillon v. District of Columbia Dep't of Emp't Servs.*, 912 A.2d 556, 561 (D.C. 2006) (internal citations omitted).

affirmance of the ALJ's judgment that partial, not total, admissibility of the Maryland evidence was appropriate for this proceeding.

## B. Causation Finding

Metro Fire next argues that the CRB erred in affirming the ALJ's finding that Green's condition was "medically causally related" to his accident on March 6, 2015. There is a statutory presumption that a workers' compensation claim "comes within the provisions of [the Workers' Compensation Act]."[11] In order to benefit from this presumption, however, the complainant must show: (1) "a death or disability"; and (2) "a work-related event, activity, or requirement which has the potential of resulting in or contributing to the death or disability."[12] Once the complainant has produced "some evidence of a disability and work-related event,"[13] the employer must provide, to the contrary, "substantial evidence that the

---

[11] D.C. Code § 32-1521 (1) (2012 Repl.); *Ferreira v. District of Columbia Dep't of Emp't Servs.*, 531 A.2d 651, 655 (D.C. 1987).

[12] *Ferreira*, 531 A.2d at 655 (emphasis omitted).

[13] *Storey v. District of Columbia Dep't of Emp't Servs.*, 162 A.3d 793, 802 (D.C. 2017) (internal quotation marks omitted).

disability did not arise out of and in the course of the employment."[14] When the employer has produced substantial evidence, "the statutory presumption drops out of the case entirely and the burden reverts to the injured worker" to show the required causal connection "by a preponderance of the evidence."[15]

Here, the ALJ found that Green had met his burden to show the required causal connection. In doing so the ALJ first found that Green had successfully invoked the statutory presumption by presenting "some evidence" of the required work-related event and potential contribution to the claimed disability.[16] In fact, the ALJ noted that Metro Fire itself "conceded" that Green had "invoked the presumption," meaning Metro Fire conceded that Green had "produced sufficient evidence" to satisfy "the presumption of compensability with regard to his accident."[17]

---

[14] *Id.* (internal quotation marks and emphasis omitted).

[15] *Id.* at 803 (quoting *Ramey v. District of Columbia Dep't of Emp't Servs.*, 997 A.2d 694, 699-700 (D.C. 2010).

[16] *See Ferreira*, 531 A.2d at 655.

[17] In making this concession, Metro Fire apparently was acknowledging that Dr. Fechter's findings, including his recommended 10-pound lifting restriction, comprised "some evidence" — medical evidence — sufficient to invoke the presumption of compensability, even though the IME physician, Dr. Gordon, had

(continued . . .)

The burden then shifted to Metro Fire, which rebutted Green's showing by referencing the IME physician, Dr. Gordon, who opined in his written report that Green was capable of performing his "pre-injury work with a 30 pound lifting restriction," not the "10-pound lifting restriction" imposed by Dr. Fechter. "Based on the unambiguous opinion of Dr. Gordon," the ALJ found that Metro Fire had "rebutted the statutory presumption" of compensability.[18]

The ALJ then weighed the evidence "without benefit of the presumption," leaving the burden on Green to show "by a preponderance of the evidence[] that his current low back condition [was] causally related to his March 6, 2015 work accident." In evaluating the parties' respective showings, the ALJ gave "more

_____

(. . . continued)

opined that the March 6, 2015, accident did not medically cause his current disability, and that a 30-pound lifting restriction was sufficient to treat Green's pre-existing 2005 injury.

[18] In evaluating the opinion of Dr. Gordon to rebut the statutory presumption, see *supra* note 17, the ALJ was relying on "substantial [medical] evidence of non-causation." *Storey*, 162 A.3d at 797. Thus, neither in determining applicability of the presumption of compensability nor in assessing the sufficiency of the employer's rebuttal did the ALJ rely on "credibility determinations." *See id.* (An ALJ may not use "credibility determinations" to decide whether the claimant is entitled to "the statutory presumption of compensability" or whether the employer has rebutted the presumption with the required "substantial evidence of non-causation." Only when the employer "rebut[s] the presumption and the burden returns to the claimant is the ALJ entitled to make credibility determinations.").

weight to the well documented and well substantiated records of Green's treating physician, Dr. Fechter," who had provided Green with continuing care, compared with the single examination and records review by Dr. Gordon. Quoting case law, the ALJ observed that "attending physicians are ordinarily preferred as witnesses rather than those doctors who have been retained to examine injured workers solely for purposes of litigation."[19] In sum, the ALJ premised its ultimate finding of medical causality on the overall quality and weight of the evidence submitted by each party.

Citing our *Lincoln Hockey* decision,[20] however, Metro Fire stresses that "opinions of the treating physician are not absolute," noting that the employer must have the opportunity to present evidence to suggest, among other things, that the treating physician "is unaware of the employee's medical history" or otherwise

---

[19] *See Stewart v. District of Columbia Dep't of Emp't Servs.*, 606 A.2d 1350, 1353 (D.C. 1992) ("[I]n assessing the weight of competing medical testimony in worker compensation cases, attending physicians are ordinarily preferred as witnesses to those doctors who have been retained to examine the claimant solely for purposes of litigation.")

[20] *Lincoln Hockey, LLC v. District of Columbia Dep't of Emp't Servs.*, 831 A.2d 913, 920 (D.C. 2003) (treating physician "admittedly did not know [claimant's] full history of head trauma, prior headaches and related symptoms, nor that [claimant] engaged in a variety of leisure sports activities following the injury.").

lacks "the factual basis" for its opinion."[21]   While that is true, we also said in *Lincoln Hockey* that a "hearing examiner may not reject the testimony of a treating physician without explicitly addressing that testimony and explaining why it is being rejected."[22]

In any event, Metro Fire had a full opportunity to argue the merits of Dr. Gordon's opinion over that of Dr. Fechter.  In the ALJ's discretionary judgment, however, Metro Fire's presentation did not undermine the primacy of Dr. Fechter's opinion that Green "was not capable of returning to his pre-injury, albeit, light duty, job after his accident of March 6, 2015, during the periods for which benefits are claimed."  The ALJ found more credible than Dr. Gordon's opinion (1) Green's own testimony that he had not been "experiencing constant pain" before the 2015 accident, coupled with (2) Dr. Fechter's opinion that Green's 2015 injury had worsened his preexisting condition — an opinion informed by Dr. Closson's report of March 4, 2015 (two days before the accident at issue here) and by Green's own candor in "honestly" telling Dr. Fechter about his chronic back pain before the March 6 accident.  Altogether the ALJ emphasized Dr. Fechter's consistent opinion that Green "had a 10 pound lifting restriction"; the doctor's

---

[21] *Id.*

[22] *Id.* at 919.

acknowledgment of Green's earlier 2005 accident "and three previous neck surgeries"; and his persuasive opinion that Green's "March 6, 2015 accident resulted in a worsening of [Green's] low back condition." We do not gainsay the ALJ's deference to Dr. Fechter. The "proper judge of credibility is the hearing examiner[,] and an appellate court cannot substitute its judgment as to credibility for that of the hearing examiner."[23]

In sum, the ALJ made the following clear finding, confirmed by the CRB, on this contested material issue of fact:[24] Based on "substantial evidence" of record, Green satisfied "his burden of producing by a preponderance of the evidence that his current low back problems [were] causally related to the March 6, 2015 work injury." After reviewing the testimonies of both Dr. Gordon and Dr. Fechter, we perceive no basis for overturning the CRB's ruling.[25]

---

[23] *Id.* at 918.

[24] The ALJ must make "a finding of fact on each material contested issue of fact." *Battle v. District of Columbia Dep't of Emp't Servs.*, 176 A.3d 129, 133 (D.C. 2018).

[25] Metro Fire's other arguments warrant passing reference. (1) We cannot agree with its contention that Dr. Fechter's opinions are "not supported by the objective medical evidence" — a contention supported only by the employer's view, rejected above, that Dr. Gordon's evidence must be viewed as superior — coupled with an argument (we find unpersuasive) that evidence from the Maryland proceeding should tip the balance in Metro Fire's favor. (2) Nor can we agree that

(continued . . .)

**C. Utilization Review**

In connection with its finding that Green's disability was "medically causally related to the March 6, 2015 work injury," the ALJ found that Green was entitled to a "neurological consultation with Dr. Ammerman, as recommended by his treating physician, Dr. Fechter." Metro Fire appears to believe that, in evaluating medical causation, the ALJ faulted the employer for failing to proffer a "utilization review"[26] that would have helped determine the relevance of a neurological consultation and thus, ultimately, causation. Metro Fire, however, did not present that argument to the CRB, and "[i]n the absence of exceptional

_____

(. . . continued)

the evidence from the written reports of Dr. Closson and Dr. Stein manifestly undermine Dr. Fechter's submitted opinion. The record shows that Green saw Dr. Closson only once after the March accident, and Metro Fire's brief on appeal appears to accept Green's testimony that he did not tell Dr. Closson about his accident. Furthermore, although Dr. Stein initially imposed a work restriction limiting Green to lifting 30 pounds, Dr. Fechter later modified that downward to a 10-pound restriction. While Dr. Stein's 30-pound judgment was similar early on to that of Dr. Gordon, Dr. Stein's determination provides no sound basis for rejecting the ALJ's discretionary call in favor of Dr. Fechter's overall assessment described above, including his judgment calling for a 10-pound limitation.

[26] "'Utilization review' means the evaluation of the necessity, character, and sufficiency of both the level and quality of medically related services provided an injured employee based upon medically related standards." D.C. Code § 32-1501 (18A) (2012 Repl.).

circumstances, we will not entertain a claim that was not raised before the agency."[27] No exceptional circumstance exists here.

Utilization reviews are commonly conducted when "there is a dispute about the necessity of proposed medical treatment."[28] In this case, however, no medical professional disputed the necessity of a neurosurgical consultation; all three physicians — Drs. Stein, Fechter, and Gordon — agreed that a neurological consultation was "recommended" (or in Dr. Gordon's case, "reasonable"). Thus, it appears that a utilization review to evaluate the need for such consultation would likely have been superfluous.

In any event, Metro Fire is wrong when arguing in its brief that the ALJ required the "Employer and Insurer . . . to present a Utilization Review to contest the medical causal relationship of the neurosurgical consultation." The ALJ's comment that Metro Fire had not proffered a utilization review meant only that the employer had elected not to exercise that option, not that the employer had an

---

[27] *Straughn v. District of Columbia Dep't of Emp't Servs.*, 176 A.3d 125, 127 (D.C. 2017) (citations omitted).

[28] *Children's Nat'l Med. Ctr. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 403, 409-10 (D.C. 2010).

obligation to do so to contest causation.[29]   And given the testimony of the IME

physician, Dr. Gordon, as well as the treating physicians, Drs. Stein and Fechter, it

appears that Metro Fire's failure to order a utilization review may have been a

judicious decision not to incur the expense.

### D. Award of Temporary Total Disability Benefits

When, as in this case, a complainant establishes a causal connection between

a workplace accident and the complainant's injury, the complainant next must

establish the nature and extent of the disability.[30]   According to our *Logan*

decision, in order to prove temporary total disability, the claimant must show (1)

"an inability to return to his [or her] usual employment."[31]   Once the claimant has

done so, (2) "the burden shifts to the employer to establish suitable alternate

employment opportunities available to claimant considering his age, education and

---

[29]   Utilization reviews may be requested "by an employer, the employee, or the Mayor." *Id.* at 409.

[30]   *See Clark Constr. Grp., LLC*, 163 A.3d at 776 ("the claimant bears the burden of showing that his [or her] disability is temporary and total.").

[31]   *Logan v. District of Columbia Dep't of Emp't Servs.*, 805 A.2d 237, 242 (D.C. 2002) (internal quotation marks omitted).

work experience"[32] — meaning "available in the community."[33] Finally, (3) "[i]f the employer meets that evidentiary burden, the claimant may refute the employer's presentation . . . either by challenging the legitimacy of the employer's evidence of available employment or by demonstrating diligence, but a lack of success, in obtaining other employment."[34]

The CRB concluded that Green had not satisfied *Logan's* first step, and thus he was not entitled to workers' compensation for the period between April 10, 2015 (when Metro Fire closed down), and May 17, 2015 (when SS&C hired Green). More specifically, said the CRB, Green had "not established entitlement" to temporary total disability benefits because Metro Fire, until it closed, had "continued to accommodate all of his restrictions," enabling him, after his injury, "to perform his usual duties" (in *Logan's* words, "his usual employment").[35]

---

[32] *Id.*

[33] *Id.* at 243.

[34] *Id.* at 243.

[35] *Id.* at 242.

Green's loss of employment, therefore, was strictly "economic in nature,"[36] not at all due to his medical condition. Green does not contest this ruling.

This CRB denial of benefits after Green left, Metro Fire serves as background for its award of benefits for the period from his termination of employment by SS&C to the time he found work at National Fire (June 27 to October 19, 2015). Metro Fire contests Green's eligibility during this period because the record, it says, conclusively demonstrates (as the CRB found for the

---

[36] The ALJ reached the same result through more convoluted reasoning, purporting to apply *Logan*. According to the ALJ, Dr. Fechter's "10 pound lifting restriction," which was more severe than any restriction "prior to the March 6, 2015 accident," meant that Green was "incapable of returning to his pre-injury duties." Accordingly, said the ALJ, Green had taken *Logan's* first step and the burden shifted to Metro Fire, which then rebutted Green's showing by referencing Dr. Gordon's opinion that Green was "capable of performing his pre-injury job." The burden then shifted back to Green, who reestablished, through the testimony of his treating physician, Dr. Fechter, that "he was not capable of returning to his pre-injury, . . . light duty job after his accident of March 6, 2015, during the periods for which benefits are claimed." Nonetheless, the ALJ rejected the benefits Green claimed for April 10, 2015, to May 17, 2015, because his "wage loss for this period was economic in nature, and thus not related to [his] disability."

Actually, while relying on burden-shifting between Drs. Gordon and Fechter, the ALJ, like the CRB, resolved only *Logan's* first step; the second step — the availability of alternate employment — begins only after a first-step finding that termination was attributable to the claimant's disabled medical condition. In finding *Logan's* first step dispositive for the same reason that the ALJ gave after navigating through three steps, the CRB concluded that the ALJ's analysis was harmless error.

earlier period) that Green was let go not for disability but for "economic reasons,"[37] this time for taking an unauthorized vacation.

The ALJ concluded, to the contrary — by selecting from ostensibly conflicting testimony — that Green had been unable "to return to his usual employment"[38] because of his claimed disability. Green had testified at the hearing before the ALJ that his employment ended "because of [his] having to do the physical therapy and the doctor's appointment[;] they felt I was missing too much time on the job, and they needed me there." Almost immediately thereafter, however, when asked when he "got released" by SS&C, Green replied that "it was the 27th[;] . . . he came to me, because I was getting ready to go on my vacation, and said, 'Well, you know, if you have to take this week off, I might have to let you go.'" The ALJ premised his finding of disability on Green's first reason, equating his medical appointments with sufficient evidence of continuing temporary total disability "related to the March 6, 2015 accident." The CRB

---

[37] See text accompanying *supra* note 34 (ALJ finds "loss of employment" for this period was "economic in nature").

[38] *Logan*, 805 A.2d at 244.

deferred to that finding,[39] albeit *dubitante*, stating that "one or more of this panel's [three] member[s] may have found otherwise" (presumably based on the second, "vacation" reason Green offered for losing his job).

In any event, we have a CRB-confirmed finding of the ALJ that Green lost his job at SS&C because of this "disability," and we can see no basis for setting that finding aside.[40] Moreover, given a sustainable finding that Green satisfied

---

[39] We are in no position to second-guess the CRB's deference here based (in its words) on the "ALJ's opportunity to observe the nature and character of a witness's demeanor," citing *Dell v. Department of Emp't Servs.*, 499 A.2d 102, 106 (D.C. 1985) ("a hearing examiner's decision [is] entitled to greater consideration if the examiner, as in this case, has heard live testimony and observed the demeanor of the witnesses.") and *Georgetown Univ. v. District of Columbia Dep't of Emp't Servs.*, 830 A.2d 865, 870 (D.C. 2003) ("[c]redibility determinations of a hearing examiner are accorded special deference by this Court.") (citations omitted).

[40] "Disability" is not merely a medical condition; it is an "economic concept," meaning a loss of wage-earning capacity attributable to a medical condition. *See* D.C. Code § 32-1501 (8) ("'Disability' means physical or mental incapacity because of injury which results in the loss of wages."); *Upchurch v. District of Columbia Dep't of Emp't Servs.*, 783 A.2d 623, 627 (D.C. 2001) ("Disability is an economic and not a medical concept, and any injury that does not result in loss of wage-earning capacity cannot be the foundation for a finding of disability."). Green's post-injury work at Metro Fire and SS&C may have provided evidence sufficient to prove that he was physically capable of continuing with light-duty work after he left those employments. However, at least with respect to the second claim period, the ALJ (confirmed by the CRB) concluded that Green's ongoing number of doctors' appointments, reflecting a disabling

(continued . . .)

*Logan's* first step, we note that neither the ALJ nor the CRB made a finding as to whether Metro Fire had addressed *Logan* step two, namely whether Metro Fire had satisfied the employer's burden to show that there were "suitable alternate employment opportunities available to [Green]" when he left SS&C that would have vitiated the compensation claim.[41]  The CRB simply affirmed the ALJ's decision that Green's "wage loss," in contrast with the first claim period, "was due to Claimant's disability" without reaching *Logan's* burden-shifting opportunity ignored by Metro Fire.

The agency's failure to address the possibility of alternate employment, however, must be assigned to the employer, for in opposing benefits for the second claim period, Metro Fire limited its contention before the CRB to insisting — contrary to the ALJ's finding — that SS&C had terminated Green's employment for economic reasons, not disability.  At the hearing, Metro Fire did not proffer the existence of alternate employment opportunities to rebut Green's claim in the event

_____

(. . . continued)

medical condition, was substantial enough to preclude meaningful employment (satisfying *Logan's* first step), absent rebuttal by Metro Fire proffering realistic employment alternatives.

[41]  *Logan*, 805 A.2d at 242.

that the ALJ would interpret Green's testimony, as it did, to reflect termination based on disability.

*Logan's* shifting burdens were evident to the parties and both tribunals from Green's cross-appeal to the CRB (not renewed on appeal to this court). The ALJ commented, as to the first claim period, that Metro Fire "did not present any evidence under *Logan* . . . establishing the availability of other jobs which Mr. Green could perform." Nor did Metro Fire present such evidence with respect to the second claim period. We are, therefore, left with the finding that SS&C terminated Green's employment because of his disability, not economic reasons. As a result, we are not in a position to overrule the CRB's compensation award for June 27, 2015, through October 19, 2015.

For the foregoing reasons, we affirm the CRB's Decision and Order.

*So ordered.*